Robert E. Bischoff, *et al.*

*v.*

John Francesa, *et al*

(No. 10155)

Submitted October 4, 1949.  Decided December 6, 1949.

Lovins, Judge, not participating.

Fox, Judge, concurring in part, dissenting in part.

*Woodroe, Butts & Kizer, John O. Kizer,* for plaintiffs in error.

*John N. Charnock, Robert K. Smith,* for defendants in error.

Riley, Judge:

Robert Bischoff and Harley E. Calvin, partners doing business as Bischoff and Calvin, filed their notice of motion for judgment in the Circuit Court of Kanawha County against John Francesa and Kanawha Corporation, a corporation, to recover $6,346.24, the alleged balance due on a written contract, dated August 30, 1942, whereby plaintiffs agreed to do certain sub-grading and paving of streets and parking areas in Point Pleasant.

The United States Housing Authority had awarded to the defendants, John Francesa and Kanawha Corporation, joint adventurers, as the lowest bidders, a contract for the improvement of housing projects, W. Va. 46031 and 46034, at the United States Ordnance Works in Point Pleasant. In order to cut expenses this contract provided that there should be a sole contractor. Defendants having elected to be the sole contractor, filed bid, performance and payment bonds with the housing authority, and arranged with several different contractors, including the plaintiffs, to furnish the equipment and to act as supervisors on various parts of the entire work covered by the contract with the housing authority.

Pursuant to the above arrangement, plaintiffs and defendants entered into the written contract of August 30, 1942, upon which the instant proceeding is based, whereby plaintiffs agreed to subgrade and pave the streets and parking areas on the two projects covered by the general contract between defendants and the housing authority. As compensation for their services plaintiffs were to receive the price at which the work to be performed by them was bid by the defendants, less ten per cent, which

ten per cent was to be retained by defendants as the latter's profit from the moneys received by them from the housing authority under the general contract.

After plaintiffs had completed their portion of the two projects, the defendants in making their final settlement, in addition to retaining ten per cent of $43,494.08, the bid price, or $4,349.40, defendants withheld the sum of $2,-591.54 (later corrected to $2,519.45), being 11.656% of $21,-615.01, the total amount of defendants' overhead cost, and an item of $86.35, as plaintiffs' portion of taxes on overhead wages and salaries; and a further sum of $3,668.36, which defendants claimed plaintiffs had agreed to under a certain alternative signed bid.

The commissioner sustained the defendants' claim to the $2,519.45 item retained by them as plaintiffs' percentage of the former's overhead, except for an item of $242.45, and to an item of $86.27 (being $86.35 less .08), as plaintiffs' portion of taxes on overhead wages and salaries; and on the $3,668.36 item found that plaintiffs were entitled to ninety per cent of the $43,494.08, the bid price, and defendants to ten per cent as per contract, and provided for interest in favor of plaintiffs from March 15, 1944. Except for a further deduction of $134.39, a percentage of an attorney fee, from the overhead item of $2,519.45, and the allowance of interest from June 16, 1948, instead of March 15, 1944, the circuit court affirmed the commissioner in his findings. Both plaintiffs and defendants excepted to the findings of the court and moved for new trials. These motions were overruled and judgment entered in favor of plaintiffs in the sum of $4,117.37, with interest from June 16, 1948, until paid. It is to this judgment that plaintiffs prosecute the present writ of error, claiming that the same is insufficient to satisfy their claim and asserting further that the interest should have been calculated from March 15, 1944.

Inasmuch as the consideration of the "overhead" items, namely the $2,519.45 and $86.27, both involve an interpretation of certain provisions of the contract of August 30, 1942, relating to the general scope of plaintiffs' under-

taking and compensation and the relative compensation of both parties, we now turn our attention to the contract.

The contract, in part, provides:

"\* \* \* in consideration of the sum of $1.00, cash in hand paid, and other considerations hereinafter fully set forth, the First Parties do hereby contract and agree with the Second Parties that the Second Parties shall furnish the supervision and equipment and direct the doing of the following items of work on said project; and for the purpose of this agreement, the prices set forth are to govern:

"*Stabilized gravel for streets, parking areas, including subgrading, etc., complete as set forth in the bid of the First Parties. Second Parties also agree to complete all berms, as directed by the Engineers.*

"All of the above, less 10%; that is, the prices to govern shall be the bid prices on the above work, less 10%. (Stabilized gravel pavement including subgrading and finishing berms at 76 cents per Sq. Yd. less 10% Calcium chloride furnished and applied at $50.00 per ton, less 10%).

"The items enumerated in the above work in the bid taken thereon are agreed to be estimated only and may increase or decrease according to the instructions of the original contracting authority."

Because the contract between the housing authority and the defendants provided for no subcontractors, the parties to the agreement of August 30, 1942, incorporated into their agreement the following paragraph, the interpretation of which raises one of the decisive questions in this case:

"The said First Parties, shall, subject to the approval of the Second Parties, furnish and pay for all materials used on said project, the bond premium on the surety bond written by the First Parties to the original contracting authority in the proportion that the above items of work bear to the entire work on said project, shall pay the gross sales tax on the remuneration for the above items, the public liability and property damage

insurance carried on the above items, the workmen's compensation insurance carried on the labor on the above items which shall be carried in the name of the First Parties, the social security tax and the old age pension costs on the labor on the above items of work, payroll of the labor placed upon the project under the direction of the Second Parties and any other costs or expenses on said work for which the First Parties might under their bond be liable. The cost of said labor, materials and insurance, and all other expenses above enumerated shall be deducted from the total aggregate amount earned on the project on the items of work set forth above, at the prices set forth above and the remaining amount, if any, shall be the remuneration of the Second Parties for the supervision, the furnishing of the equipment and the direction of the doing of the above named items. (The prices referred to in the foregoing paragraph shall mean the bid prices of the First Parties, less 10%). Payments shall be made to the Second Parties of any amounts due the Second Parties under the above agreement within three (3) days after the receipt of payment by the First Parties from the original contracting authority."

Defendants contend that by the above contract, they agreed to pay for the materials used by plaintiffs, bond premiums, gross sales taxes, liability insurance, workmen's compensation, social security tax, old age pension costs, and the payroll of the labor placed on the projects under the plaintiffs' direction, and "any other costs or expenses on said work for which the First Parties might under their bond be liable", which costs were to be deducted from the total amount earned by plaintiffs, on the theory that the deductions from plaintiffs' remuneration should be in the proportion that the payments made by defendants for the cost of labor, materials, insurance, bond premiums and taxes on the work to be performed by plaintiffs and "any other costs or expenses on said work for which the First Parties might under their bond be liable" bear to the cost of the work on the entire project. On the basis of the last-quoted paragraph of the contract of August 30, 1942, defendants claim that they are

entitled to deduct from plaintiffs' compensation such portion of defendants' total overhead as the work agreed to be done by the plaintiffs bears to the entire cost of the project.

Defendants assert, and the record discloses, that of the entire work contracted for by defendants with the housing authority, 11.656% thereof was performed by plaintiffs, and, defendants' general cost of overhead on the entire project being $21,615.01, plaintiffs' compensation is subject to a deduction of $2,519.45 of said cost. In arriving at this figure, defendants rely upon the provisions of the contract that "The said First Parties, shall, subject to the approval of the Second Parties, furnish and pay for all materials used on said project, the bond premium on the surety bond written by the First Parties to the original contracting authority in the proportion that the above items of work bear to the entire work on said project * * *." In particular, reliance is had upon the provision in the same paragraph of the contract "and any other costs or expenses on said work for which the First Parties might under their bond be liable."

As the plaintiffs, so far as their dealings with the housing authority are concerned, were not subcontractors, it became necessary that a single performance bond be given to the housing authority. The provision of the contract between the plaintiffs and defendants that the "First Parties" shall pay "any other costs or expenses on said work for which the First Parties might under their bond be liable," evidently refers to the bond given to the housing authority to secure defendants' performance under the general contract. This general contract, consisting of about two hundred pages, together with the plans and specifications on the two housing projects, is referred to in, and should be considered a part of the contract of August 30, 1942, between plaintiffs and defendants.

Under the general contract defendants were required in detail to do many things, the cost of which would enter into defendants' overhead on the entire project. Defendants were required personally to superintend the

work, or have a competent foreman or superintendent satisfactory to the housing authority on the work at all times. They were required to furnish affidavits and other detailed documents relative to the payroll and watchmen were to be provided by day and by night, including Saturdays, Sundays and holidays, from the very time the work commenced until its final completion. It was incumbent upon defendants to enforce instructions of the housing authority regarding signs, advertising, danger signals and smoking, and to prepare payrolls on forms provided by the housing authority in strict accordance with that authority's instructions. Measures to prevent accidents, which the housing authority might deem reasonably necessary, were required to be taken by defendants. The defendants were required to furnish a field office building for the use of defendants and representatives of the housing authority and to equip the same with and maintain heating, lighting and other facilities, including janitor service. Sanitary facilities were to be furnished and maintained by defendants as directed by the housing authority; the defendants were required also to furnish the essential price information, including photostatic or carbon copies in duplicate of all purchase orders in excess of one hundred dollars; and, finally, in addition to many other services detailed in the contract with the housing authority, but for the purpose of brevity not mentioned in this opinion, defendants were required, upon request, to furnish to the housing authority the itemized breakdown of quantities and prices used in computing any change that might be ordered.

Plaintiffs took the position before the commissioner, at the hearing on the commissioner's report in the circuit court, and take the same position in this Court, that there is no express authorization for defendants' retention of the $2,519.45 item, as a charge against the plaintiffs for the claimed proportion of defendants' general overhead cost, that is, 11.656% of $21,615.01, the total amount of defendants' overhead cost, and an item of $86.27, the plaintiffs' proportion for taxes on overhead wages and salaries, and, therefore, these sums are wrongfully retained by defendants.

The commissioner found and reported in defendants' favor the sum of $2,519.45, as a charge against plaintiffs' proportionate share of defendants' general overhead, less $242.45, being 11.656 per cent of $2,080.00, the salaries of the Whitneys, who are salaried officers of the defendant, Kanawha Corporation, for their work in supervising the project at Point Pleasant, and thus reducing the item of overhead contended for by the defendants to $2,277.00, or a positive finding for the plaintiffs in the amount of $242.45.

The circuit court denied defendants' claim that they were entitled to retain 11.656% of the charge of Philip H. Hill for legal services, or $134.39, on the ground that those services were rendered by Hill to the defendants before the contract with the housing authority was entered into, thus reducing the defendants' claim for a proportionate share of their general overhead to $2,142.61. Deducting this latter figure from the overhead item of $2,519.45, retained by defendants, leaves the sum of $376.84, which the circuit court credited to the plaintiffs' account. Plaintiffs on this writ of error claim that the judgment of the circuit court is erroneous in that defendants were permitted to retain any portion of the $2,519.45 as overhead.

So the initial question resolves itself into this: Whether the parts of the contract of August 30, 1942, relating to the items of expense which the defendants were authorized to deduct from the sum earned by plaintiffs under the contract, by express provision, or by reasonable and fair implication arising from the words of the contract, or by a valid modification thereof, authorized the defendants to deduct from plaintiffs' compensation 11.656% of defendants' general overhead, and the same percentage of taxes on overhead wages.

As this record does not clearly disclose whether the contract was prepared at the instance of, or by the plaintiffs, or the defendants, though there is evidence to the effect that plaintiffs did not see the contract until it was presented to them for their signatures, we are not at

liberty to apply the rule in the construction of this contract that a contract should be construed most strongly against the person who wrote it, or caused it to be written. In the interpretation of this contract, however, we are guided by the cardinal rule of contractual interpretation that a contract unambiguous in its terms must be construed so as to effectuate the intent of the parties, as disclosed by the terms, and certainly not in a manner so as to make a new contract between the parties. The rule as stated by the Virginia Court in *Ames* v. *American National Bank of Portsmouth*, 163 Va. 1, 176 S. E. 204, 216, is:

> "It is the function of the court to construe the contract made by the parties, not to make a contract for them, or to alter the contract they have made so as to conform it to the court's notion of the contract they should have made in view of the subject-matter and the surrounding facts and circumstances.
>
> "The polestar for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used.*"

See *Leckie* v. *Bray,* 91 W. Va. 456, 113 S. E. 746, and 4 Page on Contracts, 2d Ed., page 3581.

On the question whether the defendants are entitled to deduct a proportionate share of their general overhead from plaintiffs' compensation we think the instant contract, though it is so inept in language as to render intepretation difficult, is unambiguous and parol evidence of conversations occurring contemporaneously with, or prior to, its execution, is inadmissible to explain or vary the terms of the contract, in the absence of fraud or other vitiating circumstances. *Kanawha Banking & Trust Co., Exr.* v. *Gilbert,* 131 W. Va. 88, 46 S. E. 2d 225; *Hope Natural Gas Co.* v. *Reynolds,* 126 W. Va. 580, 588, 30 S. E. 2d 336; *Colerider* v. *Central National Bank of Buchannon,* 128 W. Va. 520, 37 S. E. 2d 566.

Defendants urge that because the contract provides for the prorating of the surety bond, coupled with the subsequent language of the contract, that the defendants "shall pay * * * any other costs or expenses of said work

for which the First Parties might under their bond be liable," the overhead on all the items of work which the defendants contracted with the housing authority to perform, shall be apportioned and deducted from plaintiffs' compensation in proportion as the bid price of the work performed by the plaintiffs bears to the bid price on the entire work. With this position we do not agree.

It may be readily seen from an examination of the contract of August 30, 1942, that plaintiffs, designated in the contract as second parties, undertook to

"* * * furnish the supervision and equipment and direct the following items of work on said project * * *:

"*Stabilized gravel for Streets, parking areas, including subgrading, etc., complete as set forth in the bid of the First Parties. Second Parties also agree to complete all berms, as directed by the Engineers.*"

The prices to govern the above specified items of work "shall be the bid prices on the above work, less 10%". Evidently by the words "bid prices", the parties meant the prices which the defendants gave to, and which were accepted by, the housing authority, and the deduction of ten per cent represents defendants' profit. Then follows the provision of the contract that "The items enumerated in the above work in the bid taken thereon are agreed to be estimated only and may increase or decrease, according to the instructions of the original contracting authority." Now clearly the words "The items enumerated in the above work" refer to the items of work to be done by plaintiffs, as specified in the italicized portion of the contract. The contract then reads to the effect that the defendants "shall, subject to the approval of Second Parties [plaintiffs], furnish and pay for all materials used on said project". Evidently by the words "said project", the parties meant the entire project and not the work which the plaintiffs agreed to perform. But whether the parties so intended is not material to a proper interpretation of this contract, in view of the other provisions set

forth immediately after this provision. After these words, separated by a comma, the language appears: "the bond premium on the surety bond written by the First Parties [defendants] to the original contracting authority *in the proportion that the above items of work bear to the entire work on said project*". (Italics supplied). This language of the contract, in our opinion, is clearly tied into the earlier part of the sentence which contains it that "The said First Parties shall, * * * furnish and pay for". It seems to us that by the language immediately under consideration the parties intended that the defendants should pay for a single bond on the project, namely, the performance bond with the housing authority in the proportion that the "above items of work [that is the work ·to be performed by the plaintiffs] bear to the entire work on said project." But the contract continues "shall pay the gross sales tax on the remuneration *for the above items,* the public liability. and property damage insurance carried *on the above items,* the workmen's compensation insurance carried on the labor *on the above items,* which shall be carried in the name of the First Parties, the social security tax and the old age pension costs on the labor on *the above items of work,* payroll of the labor placed upon the project under the direction of the Second Parties, and *any other costs* or expenses of said work for which the First Parties·*might under their bond be liable.*" (Italics supplied.) We think that by this language the defendants obligated themselves to furnish and pay for all of the above enumerated materials, gross sales tax, insurance, workmen's compensation, social security taxes, old age pension costs, costs of labor, on "the items of work" contracted to be performed by the plaintiffs, and set forth in the italicized portion of the contract; and that in addition thereto the defendants undertook to pay for the bond premium, but only in the proportion that the work contracted to be performed by the plaintiffs bears to the entire work to be done under defendants' contract with the housing authority. And, further, because the words "shall pay" are repeated in the contract and appear immediately after the phrase as to the bond premium, the

defendants obligated themselves to pay any other costs or expenses on said work for which the first parties (defendants) might under their bond be liable. The defendants were the only persons having a bond with the housing authority; and if they had failed to perform all of their obligations to the housing authority under the original contract, the costs and expenses thereof could be asserted against them under their performance bond. The words "any other costs or expenses" are qualified, not only by the words "shall pay", appearing earlier in the contract, but by the words "on said work". These latter words "on said work," in our opinion, under the doctrine of *ejusdem generis,* refer clearly to the "above items of work," which are the items of work to be performed by the plaintiffs. If the parties had intended the words "on said work" to have meant any work to be done on the project by the defendants, they would have incorporated in the contract, as they did as to the premium on the surety bond, the language "the entire work on said project". The words "said work," "the above items of work" and "the following items of work", appearing in the contract in their appropriate places, both before and after the specification of the work to be performed by the plaintiffs, all refer to the items of work set forth in italics in the agreement, that is, the items of work to be performed by the plaintiffs. Because the words "the following items of work" and "the above items of work" clearly refer to the work to be performed by plaintiffs, the words "on said work", incorporated in the provision "any other costs or expenses on said work for which the First Parties [defendants] might under their bond be liable" are not to be construed in their widest extent, but should be interpreted as applying only to the items of work specifically set forth in the earlier parts of the contract. "In the construction of laws, wills, and other instruments, the 'ejusdem generis rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specified meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as

those specifically mentioned. Black, Interp. Laws, 141." Black's Law Dictionary, 3rd Ed., 645, footnote to definition of *ejusdem generis*. As the language under scrutiny does not plainly manifest a contrary intent, we think the doctrine of *ejusdem generis* fully applies. In *Jones* v. *Island Creek Coal Co.,* 79 W. Va. 532, pt. 4 syl., 91 S. E. 391, this Court held: "Where general words are used in a contract after specific terms, the general words will be limited in their meaning or restricted to things of like kind and nature with those specified." See also *Darnell* v. *Wilmoth,* 69 W. Va. 704, pt. 2 syl., 72 S. E. 1023. Because the words "the following items of work" and "the above items of work" appear in the contract before the words "on said work", and are specific in their nature, dealing specifically with the items of work to be performed by plaintiffs, we think that the meaning of the words "on said work" should not be widened beyond the extent of the specific words set forth above in the contract.

But the commissioner in his report stated that in addition to the rule of *ejusdem generis,* "There is also the other rule that effect must be given to every clause of a contract if possible; here the clause 'and any other costs or expenses on said work for which the First Parties might under their bond be liable' would be without application, unless it applies to the expenses claimed by the defendants as a proper deduction" under the provisions of the contract of August 30, 1942. We think, however, that the contract specifically provides that defendants "shall pay * * * any other costs or expenses on said work for which the First Parties [the defendants] might under their bond be liable." The language, in our opinion, was intended as a catchall clause and is not, as the commissioner found, without application in the instant case under our interpretation of the contract. It was intended to provide for all other costs and expenses on the work to be performed by plaintiffs, if any there should be, which were not specifically enumerated immediately above this provision of the contract; and it may be applied and serves a purpose in the instant case, for this record discloses that there was omitted from the costs and expenses of the work to be

done by the plaintiffs enumerated in the contract, the cost of unemployment compensation insurance, which, under Chapter 1, Acts of the Legislature, 1936, Second Extraordinary Session, as amended, requires defendants as employers to make payments into the unemployment compensation fund for their employees, including the employees working on the part of the work for which plaintiffs had obligated themselves to furnish equipment and supervise the work.

There is still another reason why we think the contract of August 30, 1942, does not permit the defendants to charge plaintiffs with a proportionate share of their general overhead expenses. The parties, having agreed to apportion the cost of the bond premium by express provision of the contract, they had in mind the question of apportionment, and yet as to the other items the contract is silent on that question. If defendants had intended that the contract should obligate the plaintiffs to suffer a deduction from their compensation a proportionate share of defendants' general overhead, the contract, in addition to the provision as to the bond premium, should have contained such an express provision as to the other items, but it did not. Under the doctrine of *expressio unius est exclusio alterius,* the parties, having provided to apportion the cost of the bond premium by express provision, imply the exclusion of such provision as to the other items of cost and expense on the work to be performed by plaintiffs. In *Harbert* v. *County Court of Harrison County,* 129 W. Va. 54, 64, 39 S. E. 2d 177, 186, involving the construction of a statute, this Court said: "* * * [it is a] well recognized and long established principal of interpretation of written instruments that the express mention of one thing implies the exclusion of another, *expressio unius est exclusio alterius* * * *."

During the course of the hearing before the commissioner, the defendants sought by oral evidence to assert a modification of the contract, to the effect that plaintiffs should be charged with such cost or share of defendants' general overhead, as the cost of the work done by plain-

tiffs bears to the cost of the entire work, under defendants' general contract with the housing authority. Other than general statements contained in the testimony of B. F. Whitney to the effect that "We talked to Mr. Calvin about everything," and that "A proportionate share of the buildings would be deducted, which was agreed to orally," and a statement which Whitney said he made to Calvin that "an office of our own" was required under the contract with the housing authority, and "that would require an engineer or an office man and probably a stenographer, and the proportionate share of that was agreed to by each of the parties", there is no evidence that the plaintiffs ever agreed to pay, or consented to be charged with 11.656% of the defendants' general overhead. Plaintiffs categorically deny that they ever agreed to pay any part of such overhead. In *Charleston Lumber Co.* v. *Friedman,* 64 W. Va. 151, 160, 61 S. E. 815, this Court said, speaking through Judge Brannon, "An oral waiver of a contract 'must be clear, positive and above suspicion, and cannot be proven by mere loose, casual conversation' ". In *Monto* v. *Gillooly,* 107 W. Va. 151, pt. 2 syl., 147 S. E. 542, this Court held: "The party asserting a modification of a contract carries the burden of proof. He must demonstrate that the minds of the parties definitely met on the alteration. This burden is not sustained, as a matter of law, by merely showing that the adverse party failed to protest the change." We are of opinion that defendants have not sustained the burden of proof of establishing the modification of the contract. The evidence in this record, bearing on that question, is neither clear, positive, nor convincing. Moreover, the record discloses no consideration for the claimed modification of the written contract in regard to charging plaintiffs with a part of defendants' general overhead. B. F. Whitney specifically testified, in answer to the question: "In other words, you did not agree to give them any additional compensation for assuming these additional burdens?", "We were giving them the compensation as agreed to." "The doing of what one is already legally bound to do cannot constitute good consideration for a promise made to him." *Vance* v. *Ellison,*

76 W. Va. 592, pt. 2 syl., 85 S. E. 776. See *Whan* v. *Hope Natural Gas Co.,* 81 W. Va. 338, 94 S. E. 365; *Brown* v. *Western Maryland Railway Co.,* 92 W. Va. 111, 114 S. E. 457; *Cole* v. *George,* 86 W. Va. 346, 103 S. E. 201. Applying these authorities, we are of the opinion that defendants have failed to prove a valid, oral modification of the written contract; and their attempt to do so is indicative that the matter of charging plaintiffs with a part of defendants' general overhead, was not in the first instance intended by the parties, and therefore was not incorporated in the original contract.

From the foregoing it necessarily follows that the circuit court erred in finding that the sum of $86.27, being taxes on overhead wages and salaries, was a proper deduction from plaintiffs' compensation, and the court did not err in its finding that the sum of $242.45, being 11.656% of the sum of $2,080.00, representing compensation of B. F. Whitney and S. P. Whitney, officers of the defendant corporation, for performing the supervisory work required of the defendants under the general contract was not a proper deduction from plaintiffs' compensation. As the supervisory work performed on the ground at Point Pleasant was required by the government contract, it did not properly enter into defendants' overhead so that a proportionate share could be deducted from plaintiffs' compensation, even if our holding had been to the effect that the proportionate share of defendants' overhead was properly deductible; and the same is true as to the sum of $134.39, being 11.656% of the sum of $1,153.00 paid to Philip H. Hill for legal services, for the reason that the services were rendered prior to the entry into and execution of the contract between defendants and the housing authority, and were never a part of defendants' general overhead in performing that contract. Likewise the court did not err in finding that the sum of eight cents, being taxes on overhead wages, was not properly deductible from plaintiffs' compensation.

As to the retention of the $3,668.36 item, after plaintiffs had commenced their portion of the work on the projects,

a change order was issued by the housing authority, requiring that the streets be paved with eight inches of compacted gravel on the main streets, six inches on the service drives and parking areas, and that all of the streets were to be given a specified bituminous treatment, in lieu of the original specifications calling for six inches of loose gravel with a treatment of calcium chloride as a dust preventive.

This change required the use of ninety per cent more material on the eight-inch and fifty per cent more on the six-inch paving, new computations, and a new estimate. Plaintiffs presented a bid of $1.36 a square yard for eight-inch, $1.10 for six-inch, and 22¢ a square yard for the tar treatment, which was later accepted by the housing authority, and payments made to defendants in accordance therewith. Upon the project engineer's indication that he thought the bid too high, plaintiffs were prompted by defendants to submit an alternative bid, on a "use" and "try" basis, the figures of both bids being materially lower than that accepted. It is asserted by plaintiffs that the alternative bid was submitted not as an offer, but for use of defendants in negotiating with the housing authority. The alternative bid was never turned over to the housing authority, but was retained by the Whitneys. Defendants claim that the alternative bid, especially since it was signed at their request by plaintiff Calvin, was an offer; and that plaintiffs' remuneration on the whole project should be calculated on the basis of their "try" bid — the higher of the two figures embraced in the alternative bid. S. P. Whitney testified, "I aimed to put in a little profit for myself." It is on the foregoing basis that the defendants have retained $3,668.36 in excess of the ten per cent of $43,541.87, the latter figure being the sum of $43,494.08 paid by the housing authority under its contract with defendants, plus a credit of $47.79 allowed plaintiffs for salvage of buildings.

But the question whether plaintiffs are entitled to recover from defendants the sum of $3,668.36, as excess percentage retained by defendants out of plaintiffs' compen-

sation, as the circuit court held, does not involve the question of general overhead expense or an interpretation of the contract of August 30, 1942. As heretofore stated, the housing authority, after the work had commenced, directed a change in the specifications. The original contract provided that the streets and parking areas be paved with stabilized gravel, including the subgrading, paving and finishing of the berms, at seventy-six cents a square yard, less ten per cent, and that the calcium chloride furnished by defendants was to be applied by plaintiffs at fifty dollars a ton, less ten per cent. The change order issued April 1, 1943, provided that the paving of the main street was to be changed from a six-inch loose to an eight-inch compacted stabilized base; the service drives and parking areas were to have a six-inch compacted base instead of six-inch loose gravel base; and the streets were to be paved with a bituminous treatment of 6/10ths of a gallon of tar and forty pounds of aggregate a square yard, entailing approximately fifty per cent more material for the six-inch compacted pavement than for the six-inch stabilized gravel pavement; and approximately ninety per cent more material for the eight-inch compacted gravel paving than for the six inches of stabilized gravel paving. At defendants' request the plaintiff, H. E. Calvin, submitted an estimate on the new type street paving ordered by the housing authority, which provided that the eight-inch compacted gravel paving would be laid for $1.36 a square yard; the six-inch compacted gravel paving for $1.10 a square yard; and twenty-two cents a square yard for the bituminous surface treatment, from which defendants were entitled as profit to deduct ten per cent. Upon being informed that these figures had been rejected by the housing authority, Calvin submitted a second estimate, or "try" bid of $1.10 a square yard for the eight-inch paving, plus ten per cent; eighty-four cents a square yard for the six-inch paving, plus ten per cent; and seventeen cents a square yard for the bituminous surface treatment plus ten per cent, with an alternative or "use" bid of eighty-two cents and $1.08, plus ten per cent, if defendants could not get the higher price, and seventeen

cents a square yard for the surface treatment. As heretofore noted, the defendants did not submit the "try" or "use" bid to the housing authority. In fact S. P. Whitney testified that he did not intend to submit the latter figures to the housing authority as he "aimed to put in a little profit for myself." As the original contract of August 30, 1942, provided that plaintiffs' compensation shall be "the bid prices on the above work [meaning the work plaintiffs were to do under the contract], less 10%", and the record does not disclose that plaintiffs agreed to a change in this rate of compensation, there was, in our opinion, no change in the basic rate of compensation, and the figures finally accepted by the housing authority for the change in the character of paving constituted the bid prices to the same extent as if they had been originally incorporated in the contract. In fact, the contract provides that "the items enumerated in the above work * * * may increase or decrease, according to the instructions of the original contracting authority." So we think plaintiffs are entitled to the prices first bid for the increased work, less ten per cent, and, therefore, the defendants were not entitled to withhold or deduct the sum of $3,668.36 from plaintiffs' compensation, and in this regard the action of the circuit court should be affirmed.

And finally we are of opinion that the trial court erred in holding that interest should be allowed an plaintiffs' judgment from the time of the commissioner's report, June 16, 1948, and not from March 15, 1944, the date that defendants attempted to make final settlement with the plaintiffs, that being the date of their final estimate. Where a claim is liquidated or can be ascertained by computation, interest should be allowed from the date when payment should be made; and the fact that there was a dispute between the parties as to the amounts due, plaintiffs' claim, nevertheless, was capable of computation in the event they were entitled to prevail in the dispute entailed in this record. Here the unit prices under the original contract, as well as any modification due to the change order, were clearly specified. Defendants' compensation was to be ten per cent: plaintiffs' compensation

was to be the bid price less ten per cent. So plaintiffs' claim from the time defendants submitted their final estimate, showing the amount and quantity of the work done, was capable of computation, and plaintiffs, as the moneys were received from the housing authority, then and there were entitled to payment. In *Bennett v. Federal Coal & Coke Co.*, 70 W. Va. 456, pt. 1 syl., 74 S. E. 418, this Court said: "As a general rule, where plaintiff's demand is liquidated, or if unliquidated, can be readily ascertained by computation, interest thereon should be allowed, if the demand be for work done or material furnished, from the date the labor is done or material furnished, or from the date when by the terms of the contract payment should have been made." On page 459 of the opinion the Court, citing *Chapman's Adm'rs v. Shepherd's Adm'r.*, 24 Gratt. 377; *Roberts' Adm'r. v. Cocke*, 28 Gratt. 207, and other Virginia cases, said: "* * * when there is no express contract to pay interest, there is an implied contract to do so." This rule was followed by this Court in the recent case of *Lockard v. City of Salem*, 130 W. Va. 287, 43 S. E. 2d 239. We therefore hold that plaintiffs are entitled to interest from March 15, 1944, the date of final computation.

For the foregoing reasons, we reverse the circuit court (1) in finding defendants entitled to retain as a proper overhead deduction from plaintiffs' compensation the sum of $2,142.61; (2) in finding that the sum of $86.27, being taxes on overhead wages and salaries, was a proper deduction from plaintiffs' compensation; and (3) in holding that plaintiffs were entitled to interest on the sums due from the defendants only from June 16, 1948, until paid, and not from March 15, 1944, the date of the final estimate; and in all other particulars the judgment of the circuit court is affirmed and the case remanded with directions to enter a judgment in favor of plaintiffs and against the defendants in accordance with the principles herein enunciated.

> *Reversed in part;*
> *affirmed in part;*
> *remanded with directions.*

Fox, Judge, concurring in part, dissenting in part:

I concur in the opinion, prepared by Judge Riley, except that part which refuses to permit the deduction by the defendants of a proportionate part of the overhead expenses incurred by them in and about the carrying on of their contract with the United States Housing Authority. The amount of overhead expense involved, as reduced by the commissioner and the trial court, is approximately $2,142.61, and an additional allowance for taxes paid on overhead claimed to be $86.27, but which should be reduced in accordance with the reduction of the overhead expenses decreed by the court below.

I would allow these deductions on the basis of the contract between the plaintiffs and defendants, dated August 30, 1942, as written and executed, and without reliance on any modification of the terms thereof. As a matter of fact, I do not understand that any modification of the contract is claimed by any party to this litigation, unless it be what might be termed a readjustment brought about by a change in the character of work to be performed, imposed by the Housing Authority, and involving some change in prices to be paid for certain character of work. There was evidence which tended to show knowledge on the part of plaintiffs as to the expenditures made by the defendants under the contract between them, but this did not involve any claimed modification of the agreement; and aside from any such testimony, it would naturally be presumed that, in carrying on the work, plaintiffs would be bound to observe the work performed and expenditures made by the principal contractors in performing their contract with the Housing Authority, and on which the claim for overhead is based.

As pointed out in the majority opinion, the defendants contracted with the Housing Authority to do certain work in and about two projects at Point Pleasant. This work was to be performed at certain stipulated prices for material and services, and the aggregate of the contract could not be determined until the work had been completed. It has been determined, however, that the entire contract

undertaken on the part of the defendants at the stipulated prices involves the sum of $373,139.72, of which the portion performed by plaintiffs was $43,541.87, which sum included $47.79 as a credit for salvage of buildings used by defendants' agents. The principal contractors were not permitted to deal with subcontractors, but the portioning out of the work among different persons does not seem to have been barred. So it is that the principal contractors entered into an agreement, evidenced by the writing of August 30, 1942, by which the plaintiffs undertook to do certain work, included in the entire contract with the Housing Authority, at the prices at which the principal contractors had bid for the work, less ten per cent. It should be borne in mind that what the plaintiffs were to do under this contract was furnish equipment and provide supervision and direction for the work they undertook to do, and it seems to have been contemplated that the principal contractors, the defendants herein, would furnish the materials to be used on the projects, and to take care of many other items of cost and expenditures in connection with the work, some of which are set out in the contract between the Housing Authority and the principal contractors.

At this point, it seems proper to point out that the defendants herein entered into a contract with the United States Housing Authority, which is part of the record, and to secure the performance of the undertakings on their part were required to, and did enter into, a performance bond which was intended to assure the performance of all of the terms and conditions of said contract. What the requirements of the contract were, aside from the principal requirement that the work be completed according to the contract, is well stated in the majority opinion, and it is unnecessary to repeat those requirements. The point is that the original contract with the Housing Authority, covering all the work involved, or the entire project, if we choose to use that term, was covered by the written agreement and the bond executed to insure its performance, and should be considered when we deal with the

contract between the defendants and plaintiffs in this case.

The later contract, dated August 30, 1942, is referred to in the majority opinion, and provides that the second parties, the plaintiffs herein, should furnish the supervision and equipment, and direct the doing of certain work, for the prices set forth in the bid for the work made by the defendants herein to the Housing Authority, less ten per cent. It was provided that the price might be increased or diminished according to instructions of the original contracting authority. Then follows the language which is the basis of the controversy, so far as allowance of overhead expenses is concerned. That language is:

> "The said First Parties shall, subject to the approval of the Second Parties, furnish and pay for all materials used on said project, the bond premium on the surety bond written by the First Parties to the original contracting authority *in the proportion that the above items of work bear to the entire work on said project,* shall pay the gross sales tax on the remuneration for the above items, the public liability and property damage insurance carried on the above items, the workmen's compensation insurance carried on the labor on the above items which shall be carried in the name of the First Parties, the social security tax and the old age pension costs on the labor on the above items of work, payroll of the labor placed upon the project under the direction of the Second Parties *and any other costs and expenses on said work for which the First Parties might under their bond be liable.* The cost of said labor, materials and insurance, and all other expenses above enumerated shall be deducted from the total aggregate amount earned on the project on the items of work set forth above, at the prices set forth and the remaining amount, if any, shall be the remuneration of the Second Parties for the supervision, the furnishing of equipment and direction of the doing of the above named items."
> (Italics supplied.)

Considering the plain language used above, along with the terms of the agreement between the principal contractors and the Housing Authority, I am of the opinion

that the contract is plain and unambiguous. "That is certain which can be made certain," and to arrive at what the parties meant, we have only to give to the language employed its plain and ordinary meaning, and to refer to the principal contract to ascertain the obligation of the principal contractors. When we do this, we have no difficulty in ascertaining what it was that the defendants had the right to deduct from the final amount to be paid to the plaintiffs. The majority opinion agrees that while the contract is difficult to interpret, it is, nevertheless, unambiguous, and then proceeds to devote several pages to an involved and highly technical discussion of the language used in the contract in what, I think, is a vain attempt to make it mean something other than what it was intended to mean by the parties who made the agreement, and which discussion, if it proved anything, established that the written agreement is ambiguous. When this discussion ended, it left the language of the contract, "and any other cost or expenses on said work for which the parties might under their bond be liable", without any meaning whatever. The attempt to give some meaning to the quoted language is not convincing. That language should be construed to mean that the parties should go to the performance bond to ascertain the terms thereof, and to the original contract to discover what items of work were to be performed by the principal contractors, and from there on to ascertain the proportionate share of the overhead cost involved which could be deducted. If it does not have that meaning, it does not mean anything. The majority opinion ignores every word of the quoted language, in violation of the elementary principal that, in interpreting contracts, or any written instruments, an attempt should be made to give force and meaning to all of the language employed therein. The bond premiums, and various taxes and insurance premiums, which the agreement between the parties litigant required to be paid by the principal contractors, are not, so far as I can observe, included in the agreement between the Housing Authority and the principal contractors, and for that reason were specifically provided for in the con-

tract of August 30, 1942. Certain other items of taxes were paid which were not specifically provided for in said contract. After these specific items had been taken care of, there is put into the contract the broad provision that there should be deducted "any other cost or expenses on said work for which the first parties might under their bond be liable". An effort is made to play upon the words "work," "above items" and "project". But, in my opinion, it was not necessary to go to all of this trouble. There was but one project in which the plaintiffs were interested, and that was the part of the work for which they assumed responsibility and for which they were entitled to be paid the sum of $43,541.87, less ten per cent, and proper deduction for their share of overhead expense, as well as other deductions specified in their contract. The word "item" and the word "work" are used interchangeably, and, of course, refer to the project for which plaintiffs herein were responsible to the principal contractors. The effort to make this language mean something which, in my opinion, was never intended, violates the rule that in interpreting any written instrument, the intent of the parties should be made effective if possible to do so.

The majority opinion states that the contract, of August 30, 1942, was intended to leave the principal contractors, defendants herein, a profit of ten per cent. That may be true. It is not suggested that such a profit is unreasonable, and the plaintiffs herein seemed willing to permit the defendants to retain such a profit. Now by the majority opinion, they will be deprived of approximately one-half of that profit. There can be no doubt that there were heavy overhead expenses which the principal contractors were compelled to incur, in connection not only with the entire project, but for that part of the project which plaintiffs herein undertook to supervise, and that the plaintiffs received substantial benefits therefrom. The aggregate of this overhead was $21,615.01, but it included items of $2,080.00 and $1,153.00, referred to in the majority opinion which, in my opinion, were properly disallowed, bringing the overhead expenses, which, I think, the plaintiffs should

share in the proportion stated in their contract, to approximately $18,382.01. The work represented by this overhead expenditure was, of course, performed during the period when plaintiffs were on the job, and they must necessarily have observed that work. They had the benefit of a part of the facilities provided by the principal contractors. Furthermore, when the job was completed, and when some of the structures erected by the principal contractors, and charged to the overhead expense account, were disposed of, the amount received therefor was distributed among those who may be here designated as *de facto* subcontractors, including the plaintiffs, and there was no objection on the part of the plaintiffs to such distribution. They accepted their share of the salvage value of these buildings. While I do not contend that this case should be decided on that development, I do say that it tends to show that at that time plaintiffs conceded their obligation to bear their proportionate share of the overhead expenses on the entire project for which the principal contractors had contracted with the Housing Authority.

This is merely another case which, in my opinion, should be decided upon the plain language of the agreement between the parties. They made a written agreement, and used language with full knowledge of its meaning. Giving to the language employed its plain meaning, as applied to the circumstances, we have nothing more than an agreement between the parties, who are the plaintiffs and defendants herein, that the first party should pay for certain bond premiums, certain insurance premiums, certain taxes and, furthermore, should pay "other cost or expenses on said work for which the first parties might under their bond be liable." The bond executed by the defendants was a performance bond, and refers to the contract covering the entire project bid for by the defendants. When we go to that contract, we can readily ascertain just what requirements thereof were covered by the bond. The items included in the claim for overhead on the whole project are fairly within the provisions and requirements of the contract with the Housing Authority,

and in allowing a deduction for the proportionate share of these overhead expenses, we carry out what, in my opinion, was the intended purpose of the parties to the contract of August 30, 1942. When we do this, we give effect to every line and word of the contract. The commissioner before whom the testimony was taken in this case, and the trial judge, were of the opinion that a deduction for overhead on the basis apparently conceded as the best possible method of ascertaining the proportionate share of such overhead, and specified in the contract as "the proportion that the above items of work bear to the entire work on said project", properly chargeable to the plaintiffs, should be allowed. They differed somewhat as to what should be included, but I think the trial court was correct in the decree on that point, and I would affirm the same.

I would affirm the decree of the Circuit Court of Kanawha County except on the point of the allowance of interest. I am in agreement with the majority opinion that interest should run on any recovery from the 15th day of March, 1944.