William M. CULBERTSON, Jr., J. H. Franks, a mental incompetent, and Cora Franks and J. C. Franks, Committee for J. H. Franks, a mental incompetent, Plaintiffs,

v.

JNO. McCALL COAL COMPANY, Inc., a Maryland corporation, Clyborne, Inc., a West Virginia corporation, and C. A. Clyborne, Defendants.

Civ. A. No. 923.

United States District Court
S. D. West Virginia,
Bluefield Division.

Sept. 28, 1967.

Joseph M. Sanders, Sanders, Sanders
& Bivens, Bluefield, W. Va., for plaintiff
William M. Culbertson, Jr.

James W. Harman, Jr., Tazewell, Va., and L. R. Coulling, Jr., Hudgins, Coulling & Brewster, Bluefield, W. Va., for involuntary plaintiffs J. H. Franks and Cora Franks and J. C. Franks, Committee for J. H. Franks.

John S. McDaniel, Jr., Baltimore, Md., LeRoy Katz, Katz, Katz & Kantor, Bluefield, W. Va., and Carl C. Gillespie, Tazewell, Va., for Jno. McCall Coal Company, Inc., Cylborne, Inc., and C. A. Clyborne.

CHRISTIE, District Judge.

## KIND OF ACTION

This is a civil action originally instituted by William M. Culbertson, Jr., a member of a partnership known as Whitewood Smokeless Coal Company, formerly engaged in mining and shipping coal in Buchanan County, Virginia, for the purpose of requiring defendants to account for the proceeds of sale of Whitewood's coal, shipped during the period July 1, 1948 to December 31, 1955, less the agreed selling commissions, and to recover the amount due, with interest, and punitive damages.

During the period July 1, 1948 to June 15, 1954, Whitewood Smokeless Coal Company, a partnership consisting of J. H. Franks and William M. Culbertson, Jr., was engaged in mining coal in Buchanan County, Virginia, which coal it delivered in railroad cars at its tipple to defendant Jno. McCall Coal Company, Inc., Whitewood's alleged sales agent, hereinafter referred to as McCall. J. H. Franks became ill about June 15, 1954, and retired from the partnership, and thereafter William M. Culbertson, Jr., continued to mine coal under the name of Whitewood Smokeless Coal Company, which coal was likewise delivered in railroad cars at Whitewood's tipple to McCall. Culbertson contends that when Franks ceased working and withdrew from the partnership in 1954 he and Franks entered into an agreement by the terms of which he, Culbertson, took over all of the assets of the partnership, consisting largely of obsolete mining equipment, and assumed and paid Whitewood's debts and liabilities. During the period July 1, 1948 to December 31, 1955, Whitewood delivered to McCall a total of 245,011.35 tons of coal which was sold, or otherwise disposed of, by McCall.

Contending that all of the above-mentioned tonnage of coal was sold by McCall as Whitewood's exclusive sales agent and that McCall had not accounted for the sales prices, less agreed selling commissions, Culbertson instituted this action against defendants for the purpose of determining whether McCall did properly account to Whitewood for the proceeds of sales of its coal, less the agreed selling commissions, and to recover from the defendants the amount due and owing by McCall, with interest. Culbertson also asks that McCall be required to return the commissions received by McCall on certain sales with respect to which McCall did not properly account, and to pay punitive damages.

J. H. Franks was adjudicated a mental incompetent by the Circuit Court of Russell County, Virginia, on November 4, 1966, and Cora Franks and J. C. Franks were appointed the committee for J. H. Franks. Thereafter, on motion of Culbertson, and by an order entered herein on July 25, 1967, J. H. Franks and Cora Franks and J. C. Franks, his committee, were made involuntary plaintiffs herein. This order was entered over the objection of defendants, and Cora Franks and J. C. Franks, committee for J. H. Franks.

The Complaint filed herein alleges that during the period July 1, 1948 to December 31, 1955, there was a written agreement between Franks and Culbertson, doing business as Whitewood Smokeless Coal Company, and defendant C. A. Clyborne, by the terms of which it was agreed that C. A. Clyborne, or his assignee, as exclusive sales agent for Franks and Culbertson, would use all reasonable and diligent efforts in selling and disposing of Whitewood's coal at the best available market prices, and would account to Whitewood for the proceeds of sale of said coal, less the agreed selling commissions; that shortly thereafter C. A. Clyborne assigned said sales agency agreement to McCall; that during the

period July 1, 1948 to December 31, 1955, pursuant to said sales agency agreement, Whitewood delivered to McCall 245,011.35 tons of coal; that McCall sold said coal, but wilfully and intentionally misrepresented to Whitewood the sales prices of said coal and wilfully and intentionally underpaid Whitewood for its coal.

The Answer filed on behalf of defendants alleges that during the period June 1947 through January 1949, McCall paid to Whitewood the prices received by McCall for Whitewood's coal, less the agreed selling commissions. The Answer further alleges "that effective February 1, 1949, by mutual agreement, the agency portion of said Exclusive Distributorship Agreement was terminated, and that thereafter the said Jno. McCall Coal Company, Inc. *purchased* the coal from the plaintiff, trading as Whitewood Smokeless Coal Company, at prices agreed upon between the parties from time to time, and which prices were thereafter paid by Jno. McCall Coal Company, Inc. to the said Whitewood Smokeless Coal Company in the ordinary course of business."

The Answer also pleads the 5 and 10 year Statutes of Limitations and alleges that the Complaint fails to state a claim against any of the defendants upon which relief can be granted.

Thus, the two questions now before the Court are, first, whether "the agency portion" of the agreement, dated June 20, 1947, was terminated by mutual agreement of the parties as of February 1, 1949, as contended by defendants, and if not, second, whether plaintiffs' claim is barred by the 5 or 10 year Statute of Limitations.

If, as contended by defendants, the so-called "agency portion" of the agreement was terminated by the mutual agreement of the parties as of February 1, 1949, then following such termination Whitewood was not concerned with the prices received by McCall for the Whitewood coal, and there was no duty on McCall to account to Whitewood or to permit Whitewood to examine its books and records. If, however, as contended by Culbertson,

the agency portion of the agreement was *never* terminated, then the question remains whether the 5 or 10 years Statute of Limitations bars plaintiffs' claim against defendants. The answer to this last question depends upon whether Franks and Culbertson, during the statutory period, whichever is applicable, knew, or in the exercise of reasonable care should have known, that McCall was misrepresenting to Whitewood the prices received for Whitewood's coal and was wilfully and intentionally underpaying Whitewood for its coal.

Neither side demanding a jury, the case was tried to the Court without a jury.

## DESCRIPTION OF PARTIES AND JURISDICTIONAL FACTS

Defendant Jno. McCall Coal Company, Inc. is a Maryland corporation, with its principal office in Baltimore, Maryland, and is qualified to do business in the State of West Virginia. Its principal business is the buying and selling of coal and the selling of coal for various coal companies on a commission basis.

Defendant Clyborne, Inc. is a West Virginia corporation, with its principal office in Bluefield, West Virginia. It is engaged in the business of buying and selling coal and acts as agent for McCall, and possibly other companies, in the sale of coal. Defendant C. A. Clyborne is a resident and citizen of Bluefield, West Virginia, and is president and manager of Clyborne, Inc. He and his wife own practically all of its stock.

Plaintiff Culbertson is a resident and citizen of the town of Raven, Virginia, and involuntary plaintiff J. H. Franks is a resident and citizen of Swords Creek, Virginia.

Diversity of citizenship of the parties thus appears, and since the amount in controversy well exceeds $10,000.00, exclusive of interest and costs, requisite federal jurisdiction exists. 28 U.S.C.A. § 1331. The substantive law of West Virginia applies. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

## STATEMENT OF FACTS

1. EXECUTION OF "EXCLUSIVE DISTRIBUTOR," OR SALES AGENCY, AGREEMENT, DATED JUNE 20, 1947, AND ASSIGNMENT THEREOF BY C. A. CLYBORNE TO McCALL.

By virtue of a written lease, dated June 20, 1947, from J. H. Franks and defendant C. A. Clyborne, to Culbertson and Franks (plaintiffs' Exhibit No. 1), the latter were given the right and privilege of mining, by deep mining methods, the Cary seam of coal located in the M. D. Hinton Tract of approximately 1100 acres of land, and the Gillespie Tract of 2.314 acres of land, all of which land was located in Buchanan County, Virginia. In consideration of such mining rights, Franks and Culbertson agreed to pay to Clyborne and Franks, as lessors, certain royalties on all coal mined.

The said lease agreement further provided as follows:

"It is further covenanted and agreed between all the parties herein and by the Lessees that C. A. Clyborne or his assignee shall be the EXCLUSIVE DISTRIBUTOR for the entire output of all coal mined and produced from all of the tracts of land under this lease during the entire life of this lease and any renewal thereof;

"The said C. A. Clyborne as EXCLUSIVE DISTRIBUTOR covenants for himself and his Assignee that he will use all reasonable and diligent efforts in selling and disposing of said coal at the best available market price; in consideration. of said services as EXCLUSIVE DISTRIBUTOR, the said C. A. Clyborne or his Assignee shall receive a *sales commission* of Twenty Cents (20¢) per net ton of two thousand (2,000) pounds of all coal sold. In the event that market conditions become such that the selling expenses for handling this coal increases or selling costs can be shown that justify any change, the said C. A. Clyborne as distributor or *sales agent* shall receive eight per cent (8%) of the realized price on any coal sold as *sales commission.*"

The above-mentioned agreement was prepared by LeRoy Katz, Bluefield, West Virginia, defendants' attorney.

Shortly after the execution of said agreement, defendant C. A. Clyborne orally assigned to McCall such rights as he, Clyborne, had thereunder to act as "exclusive distributor," or "sales agent," for Whitewood's coal. Following said oral assignment, McCall designated defendant Clyborne, Inc. as its agent to sell the Whitewood coal, and agreed to pay Clyborne, Inc. 70% of the commissions received from Culbertson and Franks. McCall retained 30% of the commissions received.

2. SHIPMENTS OF COAL BY WHITEWOOD TO McCALL SUBSEQUENT TO AGREEMENT OF JUNE 20, 1947, AND McCALL'S METHOD OF ACCOUNTING TO WHITEWOOD.

Following the execution of said lease and agreement, dated June 20, 1947, and the assignment of the exclusive distributorship or sales agency portion of the agreement, by C. A. Clyborne to McCall, Whitewood commenced delivering coal to McCall in cars at railroad sidings in Buchanan and Tazewell Counties, and during the period July 1, 1948 to December 31, 1955, Franks and Culbertson, during the continuance of the partnership, and Culbertson thereafter, delivered to McCall 245,011.35 tons of coal, and McCall sold said coal and made monthly settlements with Whitewood. During the entire period July 1, 1948 to December 31, 1955, pursuant to an agreement between McCall and Whitewood, it was customary for McCall to make weekly advances to Whitewood for the purpose of enabling Whitewood to meet its payroll and other operating expenses, Tr. 366–7, and once a month—usually on the 20th of each month—the advances were deducted by McCall from the amounts found by McCall to be due and owing to Whitewood, and a check for the balance was sent by McCall to Whitewood. According to Culbertson's testimony, once a month

Whitewood would get a batch of mine statements and a check for the amount of the settlement up to that time. Attached to the check was a voucher showing the various orders that had been shipped out. The check supposedly represented the total amount due Whitewood, less advances, up to that time, Tr. 367–8.

During the period July 1, 1948 to February 1, 1949, defendants say that McCall accounted to Whitewood as an "exclusive distributor" for the sales price of Whitewood's coal, less the agreed selling commissions. However, as above pointed out, defendants contend that as of February 1, 1949, the "exclusive distributor" portion of the agreement was terminated by mutual agreement of the parties, and that thereafter McCall *purchased* Whitewood's coal as a wholesaler at prices agreed on from time to time. Defendants further say that subsequent to February 1, 1949, McCall paid to Whitewood the agreed purchase price of the Whitewood coal; that, therefore, subsequent to February 1, 1949, it was of no concern to Whitewood what prices McCall actually received for the Whitewood coal, and defendants frankly concede that subsequent to February 1, 1949, McCall did not account to Whitewood for the sales price of Whitewood's coal, less selling commissions, as an exclusive distributor, but rather as a wholesaler for prices agreed.

Culbertson, however, contends that the lease and agreement, dated June 20, 1947, created an agency relationship between Whitewood and McCall, Clyborne's assignee, and denies that this agency relationship was ever terminated. Culbertson contends that it was McCall's duty, during the entire period July 1, 1948 to December 31, 1955, to account to Whitewood for the proceeds of sale of Whitewood's coal, less the agreed selling commissions.

3. THE PROCEDURE FOLLOWED BY McCALL IN THE SALE OF WHITEWOOD'S COAL AND IN ACCOUNTING TO WHITEWOOD.

Of the 245,011.35 tons of coal shipped by Whitewood to McCall during the period July 1, 1948 to December 31, 1955, approximately one-half thereof was sold by McCall to General Services Administration, a department of the United States Government. The procedure for the handling of such sales to General Services Administration was as follows: McCall, after being authorized in writing so to do by Whitewood, entered into contracts with General Services Administration for the sale of the coal from the Whitewood mine. Prior to the making of such contracts, it was customary and necessary for McCall to furnish General Services Administration with a telegram or letter, signed by Whitewood, authorizing McCall to enter into such contracts.

Following shipments of coal by McCall to General Services Administration, McCall's Baltimore office forwarded invoices for the coal to General Services Administration, and General Services Administration forwarded its checks in payment of the invoices to McCall's office at Baltimore. McCall then once a month mailed a check to Whitewood covering the total amount determined by McCall to be then due and owing to Whitewood, less the advances made by McCall to Whitewood up to that time. However, at no time was Whitewood furnished with copies of invoices mailed to General Services Administration.

McCall's procedure for handling sales of Whitewood's coal to persons, firms and corporations other than General Services Administration, and in accounting to Whitewood, appears to have been as follows: Following the shipment of coal by Whitewood, McCall's Bluefield office prepared and mailed invoices on McCall's stationery to the purchasers, sending copies of such invoices to McCall's Baltimore office. The purchasers of the coal would then mail their checks to McCall's Baltimore office, and McCall would then once a month mail its check to Whitewood covering the amount determined by McCall to be due and owing to Whitewood, less advances made by McCall to Whitewood to date. However, Whitewood was not furnished with copies of the invoices mailed to the purchasers of the coal.

Although McCall never furnished Whitewood with copies of invoices mailed to McCall's customers, it was customary for McCall, during the entire period July 1, 1948 to December 31, 1955, to mail to Whitewood copies of orders for coal on blue printed forms. See plaintiffs' Exhibit No. 23, being two completed orders for coal. The copies of orders sent by McCall to Whitewood were each dated and numbered, and were addressed to Whitewood Smokeless Coal Company, Raven, Virginia, and directed Whitewood to ship a certain number of cars of certain grades of coal to McCall at either Portsmouth, Ohio; Roanoke, Virginia; or Bluefield, West Virginia scales.

The copies of orders showed the "price" of the coal referred to in the order, except in a few cases when the price was left open. In cases where the price was shown, it was shown in several different ways as follows: "Price 5.10 less 25¢ per net ton f. o. b. car mines", or "Price 5.00 per net ton f. o. b. car mines", see plaintiffs' Exhibit No. 23. In certain cases, the price was shown as follows: "Price 7.20 less 20¢ per net ton f. o. b. car mines", or "Price 6.25 less 8% per net ton f. o. b. car mines."

Plaintiffs' Exhibit No. 16, entitled "Whitewood Smokeless Coal Company Resume of Coal Shipped to Jno. McCall Coal Company 1948–1955," which was prepared by Jack Persinger, a certified public accountant, from copies of the blue order forms and white mine sheets, forwarded to Whitewood by McCall, shows in detail how the "Price" on each shipment was reported by McCall to Whitewood. According to the testimony of Culbertson and Persinger, it is possible that some of the copies of orders and mine sheets may have been lost or misplaced by Whitewood and, therefore, plaintiffs' Exhibit No. 16 does not purport to show *every* shipment of coal by Whitewood to McCall. However, the exhibit is sufficient to indicate the pattern followed by McCall in reporting the "Price" of the coal in question to Whitewood during the period July 1, 1948 to December 31, 1955. During this entire period, the printed portion of the blue order forms and white mine sheets remained the same, and it was only necessary for McCall, in ordering coal and sending copies of mine sheets to Whitewood, to fill in the blanks on these printed forms.

It will be observed from an examination of plaintiffs' Exhibit No. 16, being a Resume of Coal Shipped to Jno. McCall Coal Company 1948–1955, that the first order, numbered B–5473, dated January 1, 1948, called for Whitewood's "output after 1–3" of lump coal. The price shown was "Sales price less 8%." Nevertheless, no coal was shipped on this order since Whitewood did not commence producing coal until July 1948, Tr. 335–8.

The next order referred to in plaintiffs Exhibit No. 16 was order number B–4391, dated July 22, 1948, which called for Whitewood's "output" of run-of-mine coal. The price was shown as follows: "Sales price less 20¢." Thereafter, and until September 23, 1948, the "Price" was shown as a certain price "less 20¢."

Commencing on September 23, 1948 and continuing throughout the remainder of 1948, the prices were shown as certain prices "less 8%."

During the period February 1, 1949 to August 16, 1949, sixteen orders showed certain prices "less 8%," and during the same period, thirty orders merely showed the net prices without reference to any deductions. For instance, "Price 5.10 per net ton f. o. b. car mines," or "Price 7.00 per net ton f. o. b. car mines." During the period January 1, 1949 to August 16, 1949, on two orders no price whatever was shown.

During the period August 16, 1949 to September 1, 1951, with two exceptions, only net prices were shown, with no reference to deductions or commissions. The exceptions were an order dated May 13, 1950, showing the price of $4.00 per net ton less 20¢, and an order dated July 6, 1951, on which no price whatever was shown.

During the period September 6, 1951 through 1954, however, with only a few exceptions, the prices shown on the or-

ders and mine sheets were certain prices "less 25¢." Instances of this kind were as follows: "Price 5.10 less 25¢ per net ton f. o. b. car mines." See plaintiffs' Exhibit No. 23. The exceptions were seventeen orders which merely showed net price with no reference to deductions or commissions.

During 1955, all orders and mine sheets showed merely net prices with no reference to deductions.

Defendants contend that the different methods of reporting prices, as shown on plaintiffs' Exhibit No. 16, support their contention that from February 1, 1949 through 1955, McCall *purchased* Whitewood's coal at prices agreed on from time to time and refute Culbertson's contention that the agreement of June 20, 1947, created an agency relationship and that such agency relationship was never terminated. Defendants point to the numerous instances subsequent to February 1, 1949, in which only net prices were shown without reference to any deductions, and say that this manner of reporting prices is consistent only with a purchaser and seller relationship and is inconsistent with the alleged agency relationship. Defendants further say that McCall's practice of reporting net prices in many cases was notice to Whitewood that McCall was *purchasing* Whitewood's coal and was not selling Whitewood's coal as sales agent, or at least was sufficient to put Whitewood on inquiry.

However, Culbertson points out that the prices shown on the orders and mine sheets from July 22, 1948 to September 14, 1948 showed certain prices "less 20¢" per ton, which was the commission McCall was entitled to receive under the agreement of June 20, 1947. Culbertson further points out that, pursuant to the agreement of June 20, 1947, McCall increased its commission from 20¢ per ton to 8% of the selling price, and insists that he understood that McCall deducted 8% of the selling price from September 23, 1948 until the early part of September 1951, when, by agreement, the commission was reduced from 8% of the selling price to 25¢ per ton, and from the date

of such reduction he, Culbertson, understood that McCall was deducting 25¢ per ton for its commission, and accounting to Whitewood for the balance.

Culbertson testified that when he received copies of the orders and mine sheets from McCall, showing merely net prices with no deductions, he assumed that McCall had deducted its selling commission and that, to enter the transactions on Whitewood's books, he then reconstructed McCall's figures and determined the amount of the commission so as to ascertain the price for which McCall sold the coal, Tr. 339. Culbertson stated that his reason for reconstructing McCall's figures in Whitewood's books and showing McCall's commission and the prices McCall received for the coal was that he had to determine the gross selling price of the coal in order to take depletion in Whitewood's income tax returns, Tr. 352–3.

An examination of Whitewood's books, plaintiffs' Exhibits Nos. 19 and 20, would indicate that the books are authentic and that the entries therein were made at or about the time of the transactions.

Culbertson was asked if, upon receiving copies of orders and mine sheets showing net prices with no deductions, he inquired of Clyborne whether McCall had deducted its commission from the price shown. Culbertson replied that he made no such inquiry, but assumed that McCall's commissions had been deducted, Tr. 339, 346–7. Culbertson further testified that frequently Clyborne would call him on the phone and advise him that McCall had a certain price for so many tons of coal; Culbertson would say all right and would ship the coal. If, when Whitewood received a check for the coal, it was for *less* than the price quoted by Clyborne on the phone, he, Culbertson, assumed that Clyborne had deducted McCall's commission, Tr. 346–7.

4. THE MANNER IN WHICH McCALL RECORDED ITS TRANSACTIONS WITH WHITEWOOD ON ITS BOOKS AND RECORDS.

McCall's books and records have not been introduced in evidence or examined

by plaintiffs, but it appears from the testimony of John McCall, Jr., Tr. 185, and statements of counsel for defendants that during the entire period in controversy—July 1, 1948 to December 31, 1955—there was no change in the method in which McCall entered its various transactions with Whitewood on its books or in the manner in which McCall accounted to Whitewood, Tr. 185. During the entire period in controversy, McCall regarded itself as the *purchaser* of Whitewood's coal, also regarding itself as such even prior to the alleged modification of the agreement of June 20, 1947. According to counsel for defendants, "a distributorship involves a purchase of coal and a resale of coal, so naturally it is recorded on your (McCall's) books as a purchase of coal and a resale of coal," Tr. 28. Counsel for defendants also say, Tr. 34–5, "The details of those orders were entered on McCall's books and they were entered with exactly the same procedure, by the same people, after January of 1949, as before, because there was no reason to change the method of entry. It's the contents that change, not the method of making the entry."

5. THE ALLEGED MODIFICATION OF THE WRITTEN AGREEMENT DATED JUNE 20, 1947, UNDER WHICH McCALL OBTAINED WHITEWOOD'S COAL.

As above pointed out, defendants contend that the written agreement, dated June 20, 1947, under which McCall sold Whitewood's coal, was, by mutual agreement, modified as of February 1, 1949, and thereafter McCall *purchased* Whitewood's coal, as a wholesaler, at prices agreed on from time to time. Since it is defendants' contention that prior to the modification of the written agreement, it also *purchased* Whitewood's coal, it is not quite clear why McCall would wish to so modify the contract. However, defendants do contend that the written agreement was so modified as of February 1, 1949.

On the other hand, Culbertson denies that he or Franks ever agreed to such modification of the agreement and denies that such modification was ever discussed. Therefore, since the real relationship existing between McCall and Whitewood during the period in controversy is the controlling issue in this case, it becomes necessary to consider the evidence bearing on this issue.

Clyborne testified that about August 1, 1948, Culbertson began complaining about the prices received by Whitewood for its coal, Tr. 69, 74–6; that since about August 1, 1948, Culbertson had been complaining "relentlessly" about prices, Tr. 68; that in view of Culbertson's constant complaints and in order to promote harmonious relations with Whitewood and in order to give Whitewood the right to accept or reject orders, he, Clyborne, suggested to Culbertson and Franks that thenceforth McCall would *purchase* Whitewood's coal as a wholesaler, at prices agreed on from time to time, and such an agreement was entered into between Franks, Culbertson and Clyborne, effective February 1, 1949, and such agreement continued in effect throughout the remainder of the period in controversy. Clyborne's testimony concerning the alleged modification of the agreement is rather voluminous, Tr. 67–103.

Clyborne testified that he was "sure" he had, on one occasion, in his office at Bluefield, West Virginia, discussed with Franks the termination of the "exclusive distributor" relationship, Tr. 123–4. Clyborne was then confronted with his discovery deposition, taken April 7, 1966, from which it appeared that he did not remember *where* the alleged conversation occurred, whether in Bluefield or Buchanan County, or whether it was a telephone conversation, Tr. 125–7. Asked to explain the apparent inconsistency in his testimony, Clyborne said, "I dug back in the researches (sic) of my mind and discussed it with my associates * * *" Tr. 125–6.

Clyborne further testified that pursuant to his agreement with Franks and Culbertson, he wrote a letter, dated January 28, 1949, to Whitewood Smokeless

Coal Company—plaintiffs' Exhibit No. 28—which reads as follows:

"Gentlemen:

"Confirming conversation with Bill today.

"Our mutual friend Bill has frequently complained about prices. So as a means of maintaining harmonious relations and in line with his request following, as stated, his discussion with you it is agreeable with me for us to mutually disregard the *Agency* clause of the contract and I will handle your output in the capacity of a wholesaler, effective four days hence—February 1st.

"Accordingly our buying orders will be sent to you concurrently with sales of your coal and you shall have the option to accept or reject them. Of course, my exclusive distribution rights are retained."

Clyborne, however, did not recall sending a copy of this letter to McCall's Baltimore office, Tr. 82, and Culbertson denied that Whitewood received the letter or that Whitewood agreed to any such modification of their business relationship as set forth in the letter, Tr. 328. Franks has been mentally incompetent for several years, and his deposition indicates clearly that he has no recollection whatever of the matter involved in this litigation.

Clyborne also testified that after Culbertson had made a claim against McCall in the latter part of 1964, he searched for copies of the letter in question in his files for about two weeks, but was unable to locate them, but that he did find two carbon copies of the letter in question in his safe at Bluefield, Tr. 83–6; that the reason he put the carbon copies in the safe was that "we try to keep all important papers in the safe," Tr. 84, and that this was "a very valuable letter," Tr. 87. He testified that he took the two carbon copies of the letter with him to Baltimore in the latter part of 1964 and showed them to his attorney, Tr. 85, but that he later lost or misplaced the carbon copies, Tr. 83–4; that the carbon copies did not indicate that he mailed a copy of the letter to McCall at Baltimore, Tr. 87. However, before losing or misplacing the two carbon copies of the letter, Clyborne said he made "10 or 12 (photographic) copies of the copy," Tr. 84–6. In explaining how he lost the two carbon copies, Clyborne said, "I had them (2 carbon copies) all in a batch of papers in a clothes box, and going over these different papers and making notes," Tr. 85.

Clyborne insisted that the only reason he had for suggesting a modification of the written agreement of June 20, 1947, was to promote harmonious relations with Whitewood and to enable Whitewood to agree on prices in advance, and to reject orders that it did not desire to fill, Tr. 68–9, 74–7. Clyborne said that following the modification of the agreement, McCall and Whitewood would "agree on each specific order," Tr. 75. However, the evidence indicates rather clearly that Whitewood never at any time, either prior or subsequent to the alleged modification, rejected an order or refused to ship. See Clyborne's testimony, Tr. 79, 82, 123, 130–2, and Culbertson's testimony, Tr. 345–6.

Clyborne's testimony with reference to the manner in which McCall ordered coal from Whitewood subsequent to February 1, 1949, is somewhat inconsistent and contradictory. For instance, in certain parts of his testimony, Clyborne says that McCall and Whitewood would, in nearly every instance, agree on the price in *advance*, and before McCall mailed the order to Whitewood, Tr. 80–1, 120–1. Clyborne was later asked in what manner Whitewood advised McCall that an order was accepted, to which he replied that such acceptance would be indicated by Whitewood by starting shipments on the order, Tr. 122, 132.

Clyborne was asked on cross examination why, if McCall was the *purchaser* of Whitewood's coal subsequent to February 1, 1949, the orders sent by McCall to Whitewood and the mine sheets prepared by McCall continued, in many cases, to show certain prices "less 8%,"

or certain prices "less 25¢," and Clyborne's explanations, which are somewhat inconsistent and contradictory, appear on pages 109 to 120 of the transcript. These explanations are as follows: "It is a method of trading," Tr. 109; "Well, different firms have different ways of doing business and that is one of *our* characteristics of doing business * * *. Different *operators* have different ideas about trading. It is as variable as the rainbow," Tr. 110; "Custom and practice. We buy coal like that all the time, according to the view of the operator, the way *he* operates. Each one of them have a M.O., a modus operandi. We try to gear ourselves to that," Tr. 116.

We continue to quote from Clyborne's testimony:

"Q. Why go to all the writing and the mathematics when you're buying coal as a wholesaler to show a certain price less 8% or less twenty-five cents? Why not show the price?

"A. Well, if you can show me how to conduct my business more satisfactorily, I would be glad to have you come down and show me. I am not trying to be sarcastic either. (Tr. 118)

"Q. Well, what did you mean—I am going to ask you once more—what did you mean then when you said, 'We try to gear ourselves to the modus operandi of the operator?' What did you mean by that?

"A. Some operators like a variable pattern; some like a flat price; some less 6%, some like seven, and some eight, and it all depends on who it is. No one is alike in this world; they are all different, highly individualistic.

"Q. What did Whitewood like?

"A. *Well, according to what the pattern unfolded, that is what he liked. It is clear to you. It is clear to me."* Tr. 119.

Clyborne then testified that the several different methods of showing the prices of coal was "predicated on the different grades of coal," Tr. 120. However, it is quite clear from plaintiffs' Exhibit No. 16 that the alleged "modus operandi" could not have been predicated on the different grades of coal, since the deductions from the various prices related indiscriminately to *all* grades of coal. It is true that during the period July 22, 1948 to September 23, 1948, the deductions of 20¢ per net ton related only to run-of-mine coal. Nevertheless, from September 23, 1948 to January 1, 1949, the deduction of 8% on every order related to *all* grades of coal. The same is true during the period January 3, 1949 to August 16, 1949, in all cases where the 8% deduction is shown, and it is true during the entire period September 6, 1951 through December 31. 1954, where 25¢ per ton on *all* grades of coal was deducted.

Therefore, the modus operandi referred to by Clyborne could not have been predicated on the different grades of coal and, except for Clyborne's testimony, it does not appear that Whitewood had a modus operandi, or that it cared how the prices were shown on the orders and mine sheets —whether as net prices or as certain prices less 8% or less 25¢. So far as the evidence shows, Whitewood made no objection to the different methods by which McCall showed the prices of the coal.

6. THE CORRESPONDENCE IN SEPTEMBER 1951 BETWEEN McCALL AND WHITEWOOD WITH REFERENCE TO THE REDUCTION OF McCALL'S COMMISSION FROM 8% OF THE SELLING PRICE TO 25¢ PER TON.

Culbertson, although denying that prior to February 1, 1949, he complained to McCall about prices, testified that prices began declining in 1950 and he did talk to Clyborne about prices in 1950. At that time, according to Culbertson, "We were in pretty bad shape," Tr. 330. On January 9, 1951, Culbertson wrote Clyborne—Defendants' Exhibit B—showing Whitewood's cost in producing coal, reciting the bad conditions existing in 1950, and advising that unless Whitewood got relief

immediately, it would close down "until a favorable market shows up."

Culbertson further testified that in September 1951, he and Franks entered into an agreement with Clyborne, by the terms of which, effective September 3, 1951, McCall's commissions would be reduced from 8% of the selling price to 25¢ per net ton, Tr. 412–3, and that this agreement was confirmed by correspondence between Whitewood and McCall— plaintiffs' Exhibits Nos. 4 and 5. Plaintiffs' Exhibit No. 4, a copy of a letter dated September 12, 1951, from Culbertson to R. E. Perkinson, one of McCall's employees in the Bluefield office, reads as follows:

"Please refer to invoice dated September 11, 1951, order number B–6376 in regard to the price on these four cars shipped on September 3rd and 4th, respectively.

"Mr. Franks advised me that effective September 3rd through the consent of Mr. Clyborne our coal would be sales price less 25¢ per ton commission, and in view of this fact the price on these cars shipped is $5.15 less 8% commission which nets $4.90 per ton."

Plaintiffs' Exhibit No. 5, a copy of a letter dated September 13, 1951, from Clyborne to Culbertson, reads as follows:

"Your letter of September 12th.

"The contract for 36,000 tons with the Government is on the basis of $5.10, as stated to you and Mr. Franks. Upon receipt of your letter, we checked the order, which was sent you in a routine way, and much to our surprise we note a typographical error was made—$5.15 instead of $5.10. While this is against us, we will let it stand. 25¢ from $5.10 is $4.85. Please take note accordingly."

While both Clyborne and Culbertson in this correspondence seem to have some difficulty with their arithmetic, it is clear that the two letters did confirm a previous agreement to the effect that McCall's "commission" would be reduced from 8% of the selling price to 25¢ per ton.

Clyborne testified that the agreement for the reduction of McCall's commission applied only to a 36,000 ton order from the government, and to that order alone, Tr. 135–9. To the contrary, Culbertson testified that the reduction in commission effective September 3, 1951, applied to all future shipments. However, Clyborne's testimony that the reduction in commission applied *only* to the 36,000 ton government order for $5.10 per net ton comes under shadow, since the 25¢ commission was deducted on practically every shipment from September 3, 1951, the effective date of the agreement, through December 31, 1954, and the price at which the coal was sold during said period was not $5.10 per net ton, as shown in the government order, but was for greatly varying prices—See plaintiffs' Exhibit No. 16—and the amount of coal shipped subsequent to September 3, 1951 (assuming that a railroad car would carry only 55 tons) would exceed 80,000 tons.

Therefore, the agreement, reducing the commission from 8% of the selling price to 25¢ per ton, obviously applied to orders other than the 36,000 ton government order and apparently applied to all future shipments.

John McCall, Jr., president of Jno. McCall Coal Company since 1951, testified that he was not informed of the alleged termination of the "exclusive distributor" agreement until the latter part of 1964 and he did not see a copy of Clyborne's letter of January 28, 1949, until the latter part of 1964, after Culbertson had asserted a claim against McCall, Tr. 175–6.

However, Clyborne testified that in the year 1949, he advised John McCall, Sr., who was then president of Jno. McCall Coal Company, about the change in the relationship, Tr. 88. Clyborne was then confronted with his discovery deposition, taken April 7, 1966, from which it appeared that he then testified that it was not until after Culbertson asserted a claim against McCall that he, Clyborne, "disclosed to anyone connected with Jno. McCall Coal Company" that he had writ-

ten the letter of January 28, 1949, Tr. 95–6. Clyborne's testimony concerning his conversation with John McCall, Sr. is vague and uncertain, and is insufficient to sustain a finding that Clyborne did report to McCall, Sr. the alleged modification of the agreement of June 20, 1947. Be that as it may, the mere reporting of the modification to McCall would not be binding on Whitewood if no such agreement had in fact been made with Whitewood.

As previously shown, Clyborne testified that Culbertson began complaining about prices about thirty days after Whitewood began shipping coal to McCall, and that Culbertson's constant complaints brought about the change in the relationship between McCall and Whitewood, Tr. 69. Culbertson denied such complaints and testified that the prices received by Whitewood for its coal up to January 28, 1949 were quite good; that Whitewood had no cause for complaint, and that he was well satisfied with the prices.

Plaintiffs' Exhibit No. 16, being a Résumé of Coal Shipped to Jno. McCall Coal Company 1948–1955, indicates that the first shipment of coal by Whitewood was on July 22, 1948. This exhibit may possibly indicate some slight decline in prices during the period July 22, 1948 to January 1, 1949, but if there was an *overall* decline in prices, the decrease does not appear to have been substantial. Prior to August 22, 1948, there were sales of run-of-mine coal for prices ranging from $7.20 less 20¢ down to $6.50 less 20¢. Subsequent to August 22, 1948, the run of mine prices ranged from $7.15 less 8% down to $6.25 less 8%, and on one order for run of mine, the price was $6.10 less 8%.

Plaintiffs' Exhibit No. 21, all of which except the last column was admitted in evidence without objection, shows what Whitewood earned and lost on its coal during the period 1948 to 1955. From this exhibit, it appears that during 1948, Whitewood shipped 16,849.55 tons, on which it earned a net profit of .956 per ton, which was more than twice what it earned in 1949 or 1950. In 1952, Whitewood made 8¢ per net ton, and in all other years it lost money. On the total of 245,011.35 tons shipped by Whitewood to McCall during the period 1948 to 1955 inclusive, Whitewood's average earning was .156 per ton.

An examination of plaintiffs' Exhibit No. 16 shows that there were nine different items subsequent to February 1, 1949 on which no price whatever was shown. On four of the orders, there was no reference to price; on three of the orders, the words "will advise" followed the word "price"; and on three of the orders "as advised" followed the word "price."

Plaintiffs' Exhibit No. 10 was a form letter prepared by McCall and mailed to Whitewood, with the request that Whitewood sign the letter and return it to McCall. This form letter, introduced in evidence without objection, reads as follows:

"John McCall Coal Company
Bluefield, West Virginia

"Gentlemen:

"*As exclusive sales agent* and distributor for our coal, you are authorized to offer all or any part of our tonnage to the State of North Carolina under Bid 51136 opening March 1, 1951 covering coal requirements for a period of twelve months ending March 31, 1952.

Very truly yours,

Whitewood Smokeless Coal Company
By: ——————————"

As previously shown, McCall entered into several contracts with General Services Administration for the sale of Whitewood coal. Contract No. TS–7981 covered the shipment of coal from July 1, 1948 to June 30, 1950. In that contract, the capacity in which McCall acted does not appear. Contract No. TS–20193, which covered the shipment of coal from July 1, 1950 to June 30, 1951, designated McCall as "exclusive sales agent." Contract No. GS–03S–419 covered the shipment of coal from July 1, 1951 to June 30, 1952, and in this contract McCall was likewise designated as "exclusive sales

agent." Thereafter and in subsequent contracts, McCall was designated as "distributor."

It appears from the evidence that in two cases, Whitewood received from McCall substantial retroactive wage increases paid by the government, Tr. 144–5, 350–2. It further appears that during the period in controversy, McCall frequently incurred penalties on account of impurities in the Whitewood coal, and in its settlements with Whitewood, it deducted these penalties from the proceeds of sale of Whitewood's coal, Tr. 351.

Clyborne testified that subsequent to February 1, 1949, Whitewood had the option of accepting or rejecting sales made by McCall; that "he (Whitewood) has the right of refusal if we couldn't match his price that some competitor offered him he could sell to others," Tr. 75. See Defendants' Exhibit F, copy of letter dated July 8, 1955, from Whitewood to Clyborne.

As above pointed out, the evidence shows, however, that Whitewood never in fact rejected an order sent to it by McCall or refused to ship. Neither does it appear that Whitewood ever sold its coal to another at a better price than that offered by McCall, although it does appear that Whitewood *purchased* some Cary seam coal, and sold it to others.

### 7. ADMISSIBILITY OF EVIDENCE OFFERED BY CULBERTSON OF McCALL'S DEALINGS WITH PINE OAKS COAL CORPORATION.

Culbertson offered in evidence an agreement between McCall and Pine Oaks Coal Corporation, dated October 25, 1955,—plaintiffs' Exhibit No. 11—under which McCall purported to act as "exclusive distributor" for Pine Oaks Coal Corporation. In this agreement, McCall undertook to use its best efforts to resell Pine Oaks coal for the best price obtainable, and for its services McCall was to receive 6% of the sales prices. The agreement between McCall and Pine Oaks was substantially the same as the agreement dated June 20, 1947 between McCall and Whitewood, except that in the Pine Oaks contract McCall was to receive only 6% of the sales prices.

Culbertson then offered to show by Clyborne that from 20 to 25 blue order forms sent by McCall to Pine Oaks showed certain prices "less 6%"; that on 24 of the orders, the price was shown as "Price 4.93 net ... per net ton f.o.b. car mines," or some other price "net ... per net ton f.o.b. car mines"; and on 4 of the orders, the prices were shown as "Price 4.70 per net ton f.o.b. car mines," or some other price "per net ton f.o.b. car mines." In 2 of the orders, no price whatever was shown. In those orders, the words "will advise" followed the word "price," Tr. 160–3.‹

This evidence was offered by Culbertson for the purpose of proving that McCall was Pine Oaks' sales agent, and that McCall's method of showing prices in orders sent by it to Pine Oaks was similar to McCall's method of showing prices in the orders sent by McCall to Whitewood during the entire period July 1, 1948 to December 31, 1955. However, defendants objected to this evidence as being irrelevant. The Court reserved its ruling, allowing it to go in nevertheless for the benefit of the record. We now overrule the objection and find that evidence of the method in which McCall quoted prices under its sales agency agreement with Pine Oaks was relevant and material, since McCall pursued the same method in reporting prices to Whitewood under a like contract. This ruling will likewise apply to all the other objections made by defendants appearing in the record, relating to the testimony and exhibits offered by Culbertson in the Pine Oaks matter and on which rulings were reserved.

We reach this decision because it appears that the circumstances in the Pine Oaks case, as shown by the record, were so similar in nature and point of time to those of the instant case that they tend to show a general plan or scheme on the part of McCall to deceive. A detailed recital here of the facts and circumstances of the Pine Oaks case would seem to be unnecessary to a resolution of the issues involved in the case before us. Suffice it

to say that Pine Oaks, becoming suspicious that McCall was not properly accounting to it, engaged counsel to take the matter up with McCall. Counsel so employed wrote McCall requesting permission to examine McCall's books. McCall responded by saying it was not indebted to Pine Oaks in any amount, but that Pine Oaks was indebted to it for an amount "largely in excess of the amount due for coal invoiced," plaintiffs' Exhibit No. 12, see also McCall's testimony, Tr. 194. Later, there was a conference between McCall, Clyborne, and their attorneys on the one hand, and Pine Oaks and its attorneys on the other, at which it was agreed that Pine Oaks could audit McCall's books, Tr. 194–200. However, the next day McCall's check, dated December 20, 1961, for $33,671.05, payable to Pine Oaks Coal Corporation, was mailed out of McCall's Baltimore office to Pine Oaks, accompanied by a letter, plaintiffs' Exhibit No. 13. McCall posted on its ledger a credit memorandum in favor of Pine Oaks in the sum of $44,-807.38, Tr. 194–5, indicating the advances it had made Pine Oaks against coal shipped amounted to only $11,136.33, leaving owing to Pine Oaks a balance of $33,671.05, which Pine Oaks later accepted as a satisfactory adjustment of the account.

Some two years later, in 1963, Culbertson learned of this settlement in a chance conversation with R. E. Belcher, the president of Pine Oaks, Tr. 356 et seq., and as a result employed counsel after first making some investigation of his own.

It seems to be conceded by McCall that during the period 1955 to 1961, inclusive, it deliberately underreported to Pine Oaks the sales prices of Pine Oaks' coal. Its excuse for so doing was that it was thus protecting itself against advances made by it from time to time to Pine Oaks, but the wide difference ($33,671.-05) which McCall later paid Pine Oaks in settlement demonstrates the absurdity of its contention.

All of the testimony concerning the sales of Pine Oaks' coal by McCall was offered by Culbertson for the purpose of showing that McCall perpetrated a fraud on Pine Oaks, similar to the alleged fraud perpetrated by McCall on Whitewood, and such testimony is now admitted into evidence and considered by the Court for that purpose only.

The law seems to be well settled that in civil cases, where fraud is an issue, evidence of other fraud of like character, committed by the same party, at or about the same time, is admissible to indicate a scheme, plan or design on his part broad enough to include the act in question. 20 Am.Jur. (Evidence) Sec. 303, pages 281–282, gives the general rule thusly:

"The law in civil cases, as well as in criminal cases, permits proof of acts other than the one charged which are so related in character, time, and place of commission as to tend to support the conclusion that they were part of a plan or system or as to tend to show the existence of such a plan or system. Thus, when one's motive, malice, or ill will or his intention or good or bad faith in doing or omitting to do certain acts becomes an issue, his acts, statements, and conduct on other occasions which have a bearing upon his motive or intention upon the occasion in question are competent evidence. Where several forgeries were a part of the same transaction and tend to show a common plan or scheme, evidence of other forgeries or alterations is admissible upon an issue of forgery or alteration in a civil case. Where fraud is an issue, evidence of other similar frauds perpetrated by the same person on or about the same time, is admissible particularly where the acts are all part of one general scheme or plan to defraud."

In States v. Riss & Co., Inc., 139 W. Va. 1, 80 S.E.2d 9, it is said that,

"In an action to recover the value of a cargo allegedly destroyed by fire following an accident, evidence of other accidents involving similar cargo, in which the cargo was allegedly destroyed by fire, which accidents oc-

curred closely in point of time with the accident in question, is admissible under the defense of fraud to show a general plan or scheme or intent to defraud."

In the case of Shingleton Bros. v. Lasure, 122 W.Va. 1, 6 S.E.2d 252, Syl. 1, it is stated,

"In a civil case there may be proof of acts other than the one involved if they be so related in character, time and circumstances as to tend to establish a plan or system inclusive of the act in suit."

In the case of First National Bank of Pennsboro v. Barker, 75 W.Va. 244, 83 S.E. 898, Syl. 4 reads as follows:

"To prove, in a civil action, the perpetration of a criminal or fraudulent act by any person, evidence of other similar acts done by him, conduct on his part, importing the same and his admissions thereof are admissible, provided they are so connected in time, purpose and character as to indicate a scheme, plan or design on his part, broad enough to include the act in question."

In the case of Piedmont Bank v. Hatcher, 94 Va. 229, 26 S.E. 505, the Court held that where fraud in the sale of property is an issue, evidence of other frauds of like character, committed by the same party, at or about the same time, is admissible. The Court held that *large latitude is always given to the admission of evidence where the charge is fraud.*

In the case of Miles F. Bixler Company v. Dunsmore, 109 W.Va. 727, 156 S.E. 72, the Court held that evidence of an agent's fraud, in procuring a similar order, was admissible to corroborate defendant's testimony as to fraud.

In the case of Baldwin v. Warwick (C. C.A. 9th Cir), 213 F.2d 485, Syl. 3 reads as follows:

"In action by real estate dealer for damages on ground that defendants, pursuant to conspiracy between them, had defrauded dealer by trick and device inducing amnesia in him by means of drugged drinks with result that he had sustained gambling losses, testimony of other real estate men showing similar experiences they had had with defendants was admissible for limited purpose of showing existence of overall scheme on defendants' part."

In the case of Osborne v. Holt and Woodson, 92 W.Va. 410, Syl. 1, 114 S.E. 801 reads as follows:

"Evidence of similar representations, made to others, by one soliciting subscriptions to the capital stock of a corporation, to induce purchases of such property, are admissible in a suit for damages by one who purchases stock on the faith of fraudulent representations, not as evidence of the statements made to the plaintiff in such suit, *but as showing the inclination of mind of the party charged with making the representations on the subject.*"

In the case of Wilson v. Carpenter's Administrator, 91 Va. 183, 21 S.E. 243, a suit to cancel a contract on account of false representations by an agent, the Court held that evidence of similar statements made by the agent to other people at other times, though not competent to prove what occurred when the contract in question was made, might be "introduced to show the bent of the agent's mind."

Thus, the evidence offered by Culbertson, tending to show the practicing of fraud and deceit by McCall against Pine Oaks, in a similar transaction, over a similar period of time, and in the same general area, though not competent to prove the misconduct charged by Culbertson in the instant case, nevertheless is admissible for the purpose of showing "the bent of the agent's [McCall's] mind," or as said by the Court in the case of Osborne v. Holt, supra, for the purpose of "showing the inclination of mind" of McCall, the agent.

### THE ISSUES INVOLVED

From the foregoing statements of facts and analysis of the evidence, it may be observed that the controlling issues in this case are:

1. What was the nature of the agreement dated June 20, 1947, under which

McCall, as Clyborne's assignee, undertook to sell Whitewood's coal?

2. Was the agreement of June 20, 1947, modified as of February 1, 1949, as contended by defendants, or did the agreement continue in effect during the entire period in controversy?

, 3. If the agreement of June 20, 1947 was not modified, but continued in effect, is the claim of Franks and Culbertson now barred by the five or ten year Statute of Limitations?

These questions will be discussed in the order stated.

A. WHAT WAS THE NATURE OF THE AGREEMENT DATED JUNE 20, 1947, UNDER WHICH McCALL, AS CLYBORNE'S ASSIGNEE, UNDERTOOK TO SELL WHITEWOOD'S COAL?

This question has been briefed by counsel for plaintiffs and defendants. Counsel for plaintiffs assert that under the agreement dated June 20, 1947, McCall, as Clyborne's assignee, was Whitewood's exclusive sales agent. However, counsel for defendants, although conceding that under the agreement McCall acted in a fiduciary capacity, deny that McCall was a sales agent for Whitewood, exclusive or the agreement McCall was an "exclusive distributor," and as such exclusive distributor was the *purchaser* of Whitewood's coal, Tr. 28–30, 166–8; that, as such purchaser, McCall took title to the coal at Whitewood's tipple and was responsible to Whitewood for the sales price of the coal, less commissions, even though McCall did not collect for the coal; and, furthermore, that McCall's books and records, during the entire period July 1948 through December 1955 indicated that McCall was a *purchaser* of Whitewood's coal, Tr. 28–30, 34.

It does 'not seem too important at this time to determine whether, under the otherwise. Defendants say that under agreement of June 20, 1947, McCall was Whitewood's sales agent, or whether it was an "exclusive distributor" as that term is used by defendants. It is conceded by defendants, and is quite clear, that McCall acted in a fiduciary capacity un-

der the agreement and unless the agreement was modified in January 1949, as contended by defendants, McCall continued to act in a fiduciary capacity which required it to exercise the utmost good faith in its dealings with Whitewood and to account to Whitewood for the sales prices of Whitewood's coal, less the agreed selling commissions. However, the agreement itself, and other relevant evidence, would indicate that McCall was in fact Whitewood's sales agent, and that this agency relationship was well understood by the parties to the agreement.

The agreement dated June 20, 1947, at one point refers to Clyborne as "distributor or sales agent," and the agreement repeatedly refers to Clyborne's "sales commission." The agreement was prepared by counsel for defendants and will be construed most strongly against defendants.

Clyborne's letter, dated January 28, 1949, addressed to Whitewood—plaintiffs' Exhibit No. 28—said, "* * * It is agreeable with me for us to mutually disregard the *agency clause* of the contract * * *."

Defendants' Answer—paragraph V, subtitle B, page 3—says, "Effective February 1, 1949, by mutual agreement, the agency portion of said exclusive distributorship agreement was terminated."

McCall entered into several contracts with General Services Administration for the sale of Whitewood's coal. Two of these contracts, covering the shipment of coal from July 1, 1950 to June 30, 1952, referred to McCall as Whitewood's "exclusive sales agent." In other contracts with General Services Administration, McCall was referred to as "distributor."

Defendants filed a pleading herein entitled EXCEPTION TO MOTION FOR PRODUCTION OF RECORDS AND DOCUMENTS UNDER RULE 34 OF THE FEDERAL RULES OF CIVIL PROCEDURE. We quote paragraph 2 of this pleading in its entirety:

"2. As appears from the Answer of the Defendants and particularly from sub-paragraph B of Paragraph V

thereof, *the Defendants have admitted that such agency existed in respect of coal shipped from June, 1947 through January, 1949 and have alleged that effective February 1, 1949 such agency was terminated by mutual agreement* and that thereafter the Defendant, Jno. McCall Coal Company, Inc., purchased the coal at prices agreed upon from time to time, which prices were paid by the Defendant to the said Plaintiff and J. H. Franks in the ordinary course of business."

Furthermore, plaintiffs' Exhibits Nos. 2 and 3, being copies of letters from Carl C. Gillespie, one of defendants' attorneys, to H. Claude Pobst, repeatedly refers to the termination of the "sales agency" provisions of the agreement of June 20, 1947.

The fact that all of Whitewood's coal was consigned to McCall at either Bluefield, Roanoke or Portsmouth scales, and the fact, if it be a fact, that McCall took title to the coal at Whitewood's tipple, is insufficient to overcome the provisions of the agreement itself, the construction placed upon the agreement by the parties themselves, and the other evidence to the effect that the agreement created an agency relationship. The further fact, if it be a fact, that McCall guaranteed to collect the sales price of the coal does not affect the agency relationship. However, there is no evidence that this situation ever arose or was discussed.

It seems to be well established that a principal can transfer legal title to an agent so that the agent can deal more freely with the subject matter of the agency, and there may be an agency with a guarantee by the agent that sales will be made and that the purchaser will pay. This places the risk upon the agent to the same extent as if he were the purchaser. See Restatement—Agency 2d, Section 14J, Comment b(1)(2). The ultimate distinction between a buyer and an agent is that between a fiduciary and a non-fiduciary. Restatement—Agency 2d, Section 14J, Comment a.

The case of Sallisbury v. Brooks, 81 W. Va. 233, 94 S.E. 117, seems to be in point. In that case, the Court held that the con-

tract created an agency to sell, despite language therein which indicated a contract of purchase and sale. Also see Sperry v. Premier Pocahontas Colleries Company, 87 W.Va. 223, 104 S.E. 486.

Therefore, it appears that McCall was a sales agent for Whitewood under the agreement dated June 20, 1947.

B. WAS THE AGREEMENT OF JUNE 20, 1947 MODIFIED AS OF FEBRUARY 1, 1949, AS CONTENDED BY DEFENDANTS, OR DID THE AGREEMENT CONTINUE IN EFFECT DURING THE ENTIRE PERIOD IN CONTROVERSY?

The law seems to be well settled that once the relationship of principal and agent has been clearly established, an agent, claiming a change in that relationship to that of buyer and seller, must prove by clear and convincing evidence that the minds of the parties definitely met on the alteration. Smokeless Fuel Company v. Western United Corporation (C.C.A. 4th Cir.), 19 F.2d 834, 835; Bischoff v. Francesa, 133 W.Va. 474, 56 S.E.2d 865; State ex rel. Coral Pools, Inc. v. Knapp, 147 W.Va. 704, 131 S.E.2d 81. Therefore, the question now before the Court is whether defendants have proved by clear and convincing evidence that the minds of the parties met on the alleged termination of the sales agency relationship.

The evidence bearing on this question has been fully discussed and will not be repeated at length. It will not justify the Court in holding that defendants have proved by clear and convincing evidence that the minds of the parties *met* on the alleged termination of the agency relationship. To the contrary, the weight of the evidence supports Culbertson's contention that the agency relationship was not terminated during the period in controversy and the following facts, which seem to be fully established, support this conclusion:

(a) McCall, Whitewood's sales agent under the agreement, was not notified by Clyborne of the alleged change in the agreement until the latter part of

1964. Clyborne's testimony to the effect that he discussed the change in the agreement with McCall, Sr. in 1949, is entirely too vague, indefinite and uncertain to support a finding that Clyborne did discuss the alleged change in the agreement with McCall, Sr. If, in fact, the agency relationship had been terminated, it was Clyborne's duty to promptly notify McCall of the change. His failure to do so casts doubt on his testimony that there was such a change in the agreement.

(b) McCall's method of recording on its books its transactions with Whitewood, and in accounting to Whitewood, did not vary during the entire period in controversy—July 1, 1948 to December 31, 1955. This fact supports Culbertson's contention that the agency relationship was not terminated during that period.

(c) McCall's various methods of showing prices of coal on copies of orders and mine sheets sent to Whitewood subsequent to February 1, 1949, was not, under the circumstances, inconsistent with an agency relationship between McCall and Whitewood. During the period February 1, 1949 to August 16, 1949, sixteen orders showed certain prices "less 8%." The 8% increase seems to have been permitted under the agreement in question, which provided that if Clyborne's costs increased to the point justifying an increase in commissions that the commissions could be increased from 20¢ per ton to 8% of the sales prices. From August 16, 1949 until September 1951, with few exceptions, only net prices were shown on the orders sent to Whitewood. However, from September 6, 1951 to December 31, 1954, with very few exceptions, the prices were shown as certain prices "less 25¢." The evidence fully supports the conclusion that effective September 3, 1951, Franks and Culbertson agreed with Clyborne that McCall's commission on all sales would be reduced from 8% of the sales price to 25¢ per ton. See plaintiffs' Exhibits Nos. 4 and 5. During 1955, only net prices were shown.

Culbertson testified, Tr. 346–7, that frequently Clyborne would call him and tell him that he had a price for so many tons of coal; that he, Culbertson, would say "all right" and would ship the coal, and when he received the check for the coal, if the check was for less than the price Clyborne had quoted on the phone, he, Culbertson, assumed that McCall had deducted its commission. Culbertson further testified that when he received orders showing only net prices, that he reconstructed the figures and ascertained McCall's commission and added it to the price shown on the order, so as to determine the gross selling price of the coal; and that, thereupon, he entered the transaction in his books, and that the books showed the commissions deducted by McCall. Whitewood's books, introduced in evidence as plaintiffs' Exhibits Nos. 19 and 20, are apparently authentic, and there is no reason to doubt that the entries therein were made at or about the time of the transactions therein recorded. These books clearly show that, prior and subsequent to February 1, 1949, Whitewood considered that McCall was selling Whitewood's coal on a commission basis and was not a purchaser of Whitewood's coal.

In this connection, it may be pointed out that during the period 1956 to 1961, McCall acted as exclusive sales agent for Pine Oaks Coal Corporation, and during that period McCall reported prices to Pine Oaks in different ways. In many instances only the net prices were reported, whereas in other instances certain prices were shown "less 6%." In two of the orders, no prices were shown and the words "will advise" followed the word "price." See testimony of C. A. Clyborne, Tr. 157–163.

Furthermore, if McCall, subsequent to February 1, 1949, acted as the *purchaser* of Whitewood's coal, it is strange that numerous orders did show certain prices less 8%, or less 25¢, and defendants' evidence offers no satisfactory explanation of this procedure. If, as Clyborne testified, the "less 8%" or "less 25¢" represented a wholesaler's discount, it was

entirely unnecessary and superfluous to show a certain price less the discount. It obviously would have been much simpler to show in all cases the net purchase price payable by McCall.

(d) Clyborne's testimony that prior to January 28, 1949, he entered into an agreement with Franks and Culbertson to modify the agreement of June 20, 1947, and wrote the letter of January 28, 1949, is not corroborated by any other witness, or by any other fact or circumstance. Culbertson denied that he received the letter in question. McCall's different methods of reporting prices to Whitewood subsequent to February 1, 1949, does not support Clyborne's contention that the agreement was modified since, as has been shown, these different methods of reporting prices were not inconsistent with an agency relationship. Then, too, Clyborne was unable to produce the carbon copies of the letter alleged to have been written on January 28, 1949, although he testified that the carbon copies were valuable and were kept in his safe for many years.

(e) It is defendants' contention that Culbertson's persistent complaints concerning prices, from August 1948 to January 1949, caused the parties to agree on a modification of the agreement of June 20, 1947. Culbertson, however, denied that he and Franks complained of prices and asserted that Whitewood received good prices for its coal during the period in question, and that Whitewood was well satisfied with the prices it received, Tr. 329. Culbertson's testimony that Whitewood received good prices for its coal during said period is not denied by defendants, and plaintiffs' Exhibit No. 16 indicates that the prices received by Whitewood for its coal during the period July 1, 1948 to January 1949 were very good, particularly in comparison with the prices thereafter received. During 1948, Whitewood made a profit of 95¢ per ton on its coal, which was more than twice the profit it earned in any succeeding year.

Therefore, if, during the period in question, Whitewood received good prices for its coal and was satisfied with these prices, and made no complaint, then it would be illogical that Franks and Culbertson would desire to end the agency relationship and sell their coal to McCall.

(f) Clyborne testified that the agreement of June 20, 1947 was modified in order to give Whitewood an opportunity to reject orders if the prices were not satisfactory to Whitewood. However, the evidence shows clearly that Whitewood never, at any time, rejected an order or refused to ship the coal called for in the order. Therefore, if the right to reject orders if the prices were not satisfactory to Whitewood was the reason for the alleged modification of the agreement of June 20, 1947, it is indeed strange that Whitewood never once took advantage of the opportunity and rejected an order. Whitewood's failure to reject a single order during the entire period July 1, 1948 to December 31, 1955, tends to refute defendants' contention that the parties agreed upon the alleged modification of the agreement.

C. IF THE AGREEMENT OF JUNE 20, 1947 WAS NOT MODIFIED, BUT CONTINUED IN EFFECT, IS THE CLAIM OF FRANKS AND CULBERTSON NOW BARRED BY THE FIVE OR TEN YEAR STATUTE OF LIMITATIONS?

Defendants contend that Chapter 55, Article 2, Section 6 of the West Virginia Code—the 5 or 10 year Statute of Limitations—is applicable to plaintiffs' claim; that defendants have not obstructed the prosecution of plaintiffs' claim and that, therefore, Chapter 55, Article 2, Section 17 of the West Virginia Code, which tolls the Statute of Limitations, when a defendant has obstructed the prosecution of the right, is not applicable to this case.

Plaintiff Culbertson contends that defendants did obstruct the prosecution of his claim by deliberately misrepresenting to Whitewood, over a period of years, the prices received by McCall for

Whitewood's coal, and consistently underpaid Whitewood for its coal.

Thus, the question now before the Court is whether defendants did obstruct the prosecution of plaintiffs' claim within the meaning of Chapter 55, Article 2, Section 17 of the West Virginia Code.

Defendants say that if the agreement of June 20, 1947 did create an agency relationship and if that agreement was never modified as contended by defendants, there was, nevertheless, on February 1, 1949, " * * * a sudden change and the orders which Whitewood received began to show a flat price instead of a price less 20¢ per ton or less 8%. There was no correspondence or conversation or other communication as to why this sudden change occurred, but nevertheless Culbertson did not make any inquiry whatsoever of McCall or Clyborne, notwithstanding that there were frequent telephone conversations between Culbertson and Clyborne." Defendants' brief, page 9. Defendants further say that " * * * such a radical unexplained change put Culbertson under a duty to make inquiry and to request an accounting as to the prices which were actually being received by McCall." Defendants further say that the tolling statute, Chapter 55, Article 2, Section 17, as construed by the West Virginia Supreme Court, requires that there be "some affirmative act by the defendant to conceal the existence of liability," but that there was no such affirmative act committed by defendants (page 8 of defendants' brief). And finally, defendants say that if the agreement of June 20, 1947 created an agency relationship, then Culbertson's right to an audit of McCall's books and an accounting was automatic, and that this right should have been pursued.

On the other hand, Culbertson testified that he had no reason to suspect that McCall was not correctly reporting the prices received by McCall for Whitewood's coal. He testified that it never occurred to him to ask Clyborne why some of the orders merely showed flat prices, whereas other orders showed certain prices less 20¢, less 8%, or less 25¢, Tr. 342. Culbertson said, "I just figured he done took his commission out at that particular time," Tr. 342.

Culbertson further testified, Tr. 346-7, that frequently he would talk on the phone with Clyborne and that Clyborne would advise him as to prices which McCall could obtain for Whitewood's coal; that Whitewood would then ship the coal and if, when he received a check for the coal the price was less than the price quoted by Clyborne, he, Culbertson, would assume that McCall had deducted its commission.

Strongly corroborating Culbertson's testimony that he was always under the impression that McCall was accounting to Whitewood for the proceeds of sales, less selling commissions, are the entries made, at the time, by Culbertson, in Whitewood's books—plaintiffs' Exhibits Nos. 19 and 20.

The law is well settled that the burden rests upon defendants, under their plea of the Statute of Limitations, to establish by a preponderance of the evidence that the claim of plaintiffs is barred by the Statute of Limitations. Preston County Coke Company v. Preston County Light and Power Company, 146 W.Va. 231, 119 S.E.2d 420.

In considering whether Franks and Culbertson, in the exercise of reasonable diligence, should have discovered that McCall was misrepresenting to them the prices received by McCall for Whitewood's coal and underpaying Whitewood, the relationship between McCall and Whitewood must be considered, since the law governing such a fiduciary relationship is quite different from the law governing the relationship between parties who are dealing at arms length.

"A number of decisions have laid down the rule that failure to employ the necessary means to discover the fraud may be excused when plaintiff was lulled into a sense of security *by reason of a relation of trust and confidence between himself and defendant, rendering it the duty of defendant to disclose the truth*, and when it also ap-

pears that because of this confidence plaintiff was actually deterred from sooner discovering the fraud, or even suspecting that any fraud had been perpetrated on him; in such a case, it has been held, plaintiff is under no duty to make inquiry until something occurs to excite his suspicions, and this rule applies until the influence of the confidential relation has ceased. A fortiori plaintiff is not debarred of relief where he made reasonable efforts to learn the truth, but without avail. It has been held that, where an agent commits a fraud on his principal, his mere silence in failing to disclose the facts amounts to a continuation of the original fraud and a concealment of the cause of action, so that the running of the statute is postponed according to the general equitable or statutory rule. Other decisions, however, require the exercise of diligence notwithstanding the existence of confidential relations or the relation of principal and factor." 54 C.J.S. Limitations of Actions § 194, pages 198–199.

"Where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may be excused. In such a case, so long as the relationship continues unrepudiated, there is nothing to put the injured party on inquiry, and he cannot be said to have failed to use due diligence in detecting the fraud * * Similarly, an agent, sued for fraud, cannot set up that the principal should have suspected him." 34 Am.Jur., (Limitation of Actions), Sec. 168, page 135.

" * * * However, it is generally held that 'The failure of the defrauded person to use diligence in discovering the fraud may be excused where there exists a relation of trust and confidence between the parties.' 54 C.J.S., Limitations of Actions, § 194, p. 198. This is so for the reason that a confidential or fiduciary relation imposes upon the one who is trusted the duty to exercise the utmost of good faith and to disclose all material facts affecting the relation. Also, a confidential relation by its very nature presupposes that the confiding party, in deference to the confidence and trust reposed in the other party, may in a measure relax his faculties of vigilance and act upon the assumption, until notice to the contrary, that the person in whom confidence is reposed will disclose, in the honest performance of his duty, all of the essential facts connected with the relation and take no unfair advantage. Accordingly, it is generally held that when it appears that by reason of the confidence reposed the confiding party is actually deterred from sooner suspecting or discovering the fraud, he 'is under no duty to make inquiry until something occurs to excite his suspicions.'" Vail v. Vail, 233 N.C. 109, 63 S.E.2d 202, 207–208.

"A failure to use such diligence as is ordinarily required of two persons transacting business with each other may be excused when there exists such a relation of trust and confidence between the parties that it is the duty, on the part of the one who committed the fraud and thereby induced the other to refrain from inquiry, to disclose to the other the truth." Bennett v. Anson Bank and Trust Company, 265 N.C. 148, 143 S.E.2d 312, 318.

In the case of Sun Building and Loan Association of Newark v. Rashkes, 119 N.J.Eq. 443, 183 A. 274, the Court said that equity should afford relief and "not permit the statute of limitations to give aid and comfort to a transgressor by barring relief to a victimized client who has exercised due diligence."

Defendants, in support of their contention that they have not obstructed plaintiffs' right of action, apparently rely principally on two West Virginia cases: Boyd v. Beebee, 64 W.Va. 216, 63 S.E. 304, 17 L.R.A.,N.S., 660, and Teter v. Moore, 80 W.Va. 443, 93 S.E. 342. However, as pointed out in Culbertson's brief in support of his position that the Statute of Limitations does not bar this action, neither of these cases support defendants'

contention. To the contrary, Teter v. Moore, supra, strongly supports the plaintiffs' position. Boyd v. Beebee, supra, is not in point on the facts. Both cases recognize the principle that when a defendant, particularly one acting in a fiduciary capacity, commits an act which naturally conceals itself, proof of such fact makes out a case of obstruction under the statute. In Cameron v. Cameron, 111 W.Va. 375, at pages 380–381, 162 S. E. 173, at p. 175, the Court, said,

> "Furthermore, in cases like this, where confidential relations exist between the parties and the basis of the action is actual fraud, many courts hold that mere silence on the part of the guilty party will toll the running of the statute. It has been stated many times that, if the basis of the action is actual fraud, mere silence is regarded as a continuation of the original fraud, and as constituting a fraudulent concealment * * *; and this would seem to be especially applicable to cases where the parties bear to each other a trust or confidential relation."

The evidence in this case indicates clearly that Franks and Culbertson had the utmost confidence in Clyborne and McCall. They accepted all orders sent to them by McCall and, without question, shipped the coal, although in most cases they did not know the names of the purchasers or the final destination of the coal. Franks and Culbertson never rejected an order or refused to ship. They accepted the monthly settlement checks sent to them by McCall without question and never requested permission to examine McCall's books. It would be difficult to imagine a case in which a principal reposed more confidence in his agent than the confidence and trust reposed by Franks and Culbertson in McCall.

Under the circumstances, the Court would not be justified in holding that Whitewood's acceptance of orders showing flat prices without any deductions was sufficient to charge Whitewood with knowledge that McCall was deceiving Whitewood. If McCall intended to terminate the agency relationship and *purchase* Whitewood's coal, at prices agreed on from time to time, it should have so advised Whitewood in no uncertain terms. It was McCall's duty to speak and speak loud and clear. The burden was on McCall to make its position known; not on Whitewood to take measures to detect the fraud. However, McCall did not make its position known, but continued to send orders to Whitewood, some of which showed flat prices and others of which showed certain prices less 8% or less 25¢. Such conduct was a concealment of plaintiffs' right of action, and was a continuation of the fraud.

Therefore, defendants should not be permitted to escape liability for their conduct by simply showing flat prices in some of the orders sent to Whitewood and then, when the fraud has been detected, to take the position that Whitewood should have discovered the fraud during the time it was being perpetrated.

### FINDINGS OF FACT

The Court makes the following findings of fact:

1. The written agreement dated June 20, 1947, under which McCall, as Clyborne's assignee, obtained Whitewood's coal, was not changed or modified as of February 1, 1949, as testified by C. A. Clyborne, but to the contrary, said agreement continued in full force and effect during the entire period June 20, 1947 to December 31, 1955, except that the agreement pertaining to McCall's selling commissions was modified as hereinafter shown.

2. During the period July 1, 1948 to December 31, 1955, pursuant to the terms and provisions of said lease and agreement dated June 20, 1947, as later modified with respect to commissions paid to McCall, Whitewood shipped and delivered to McCall 245,011.35 tons of coal, which McCall sold or otherwise disposed of.

3. During the period July 1, 1948 to September 23, 1948, pursuant to said lease and agreement dated June 20, 1947, McCall was entitled to receive for its

services in selling Whitewood's coal 20¢ per net ton. During the period September 23, 1948 to September 3, 1951, pursuant to said lease and agreement dated June 20, 1947, McCall was entitled to receive for its services in selling Whitewood's coal a commission of 8% of the selling price. During the period September 3, 1951 to December 31, 1955, pursuant to an oral agreement between Franks and Culbertson and McCall, later confirmed by correspondence—plaintiffs' Exhibits Nos. 4 and 5—McCall was entitled to receive for its services in selling Whitewood's coal a commission of 25¢ per net ton.

4. During the entire period July 1, 1948 to December 31, 1955, Franks and Culbertson believed, and were justified in believing, that McCall was paying to Whitewood for its coal the sales prices received by McCall for said coal, less the commissions to which McCall was entitled under the written agreement dated June 20, 1947, as modified by the agreement effective September 3, 1951.

5. During the period July 1, 1948 to December 31, 1955, neither Franks nor Culbertson had reasonable cause or grounds to believe, or suspect, that McCall was not accounting to Whitewood for the proceeds of sale of Whitewood's coal, by McCall, less McCall's agreed selling commissions.

6. During the period July 1, 1948 to December 31, 1955, McCall did not pay to Whitewood the full proceeds of sales of Whitewood's coal, less McCall's agreed selling commissions. To the contrary, with the possible exception of some three to five cars of coal, McCall sold all of the coal obtained by it from Whitewood, at prices in excess of the prices paid by McCall to Whitewood. Tr. 112–13, 142. During the entire period July 1, 1948 to December 31, 1955, McCall, through the copies of orders and mine sheets furnished by McCall to Whitewood, consistently concealed from Whitewood the prices received by McCall for Whitewood's coal.

7. Neither Franks nor Culbertson knew, or had reasonable cause to believe, until the latter part of 1963, that McCall, during the period July 1, 1948 to December 31, 1955, had misrepresented to Whitewood, or was concealing from Whitewood, the prices obtained by McCall for Whitewood's coal, or that during said period McCall had underpaid Whitewood for its coal.

In reaching these findings of fact, the Court has disregarded plaintiffs' Exhibit No. 24 (copy of letter from the General Services Administration to W. Pat Jennings and attached memorandum) for the reason that the Court believes such exhibit is inadmissible and defendants' objection thereto is accordingly hereby sustained. The Court, however, has considered the evidence of Jack Persinger, Tr. 255–60, and plaintiffs' Exhibit No. 18 (copy of U. S. Bureau of Labor Statistics Cost of Living Index, et cetera) and defendants' objection thereto is hereby overruled.

## CONCLUSIONS OF LAW

Upon the basis of the foregoing findings of fact, the Court draws the following conclusions of law:

1. Pursuant to the terms of the written lease and agreement dated June 20, 1947 (plaintiffs' Exhibit No. 1) McCall, as Clyborne's assignee, became the exclusive sales agent for the sale of all coal mined and produced by Whitewood from the lands described in said lease.

2. During the period July 1, 1948 to December 31, 1955, defendants, by reason of their conduct in misrepresenting to Whitewood the prices received by McCall for Whitewood's coal, and in intentionally concealing the prices received for Whitewood's coal, obstructed Franks' and Culbertson's right of action against defendants, within the meaning and intent of Chapter 55, Article 2, Section 17 of the West Virginia Code, and such obstruction continued up to the time of the institution of this action and now continues. Therefore, the West Virginia Statute of Limitation, Chapter 55, Article 2, Section 6, does not bar Franks' and Culbertson's right of action against defendants.

3. Franks and Culbertson have the right to make such examination and audit of McCall's books and records as will disclose the prices received by McCall for Whitewood's coal during the period July 1, 1948 to December 31, 1955, and to examine and audit such other books and records in McCall's possession, or under its control, as are relevant and material to such inquiry. Accordingly, Culbertson's Motion for production of records and documents under Rule 34 is granted.

Let judgment be entered accordingly.